**Barbara K. SHROUT, Plaintiff,**

v.

**The BLACK CLAWSON COMPANY, Defendant.**

No. C-1-85-1762.

United States District Court, S.D. Ohio, W.D.

April 13, 1988.

Paul C. Sunderland, Cinti, Ohio, for plaintiff.

J. Alan Lips, Trial Attorney, Timothy P. Reilly, James E. Burke, Cinti, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPIEGEL, District Judge:

This is an action by a female employee of the defendant Black Clawson Company for sexual harassment and employment discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiff has also asserted state law claims for intentional infliction of emotional distress. The case is before the Court after an eight-day trial to the Bench.

### Credibility of Witnesses

Because this case is essentially a swearing contest, we will first discuss our views concerning the credibility of the testifying witnesses. In weighing the testimony of each witness, we considered the relationship of each witness to the parties, the witness's interest in the outcome of these proceedings, his or her manner of testifying (especially with regard to apparent candor, fairness and intelligence), each witness's opportunity to observe or acquire knowledge about the subject matter of such witness's testimony and the extent to which such testimony was supported or contradicted by other credible evidence.

Plaintiff Barbara Shrout was the first witness to testify. Her testimony was generally consistent over the course of the lengthy examination and cross-examination at trial as well as throughout numerous hours of discovery deposition testimony and interviews with experts. Her evidence

as to the voluntary sexual relationship she maintained with her supervisor at Black Clawson, Edward Lewis, from approximately 1978 to 1981, was supported by the testimony of Lewis himself. Further, plaintiff identified several executives with Black Clawson who had heard of her relationship with Lewis and had observed the two of them together at Company events and other social functions. This testimony was also largely unrebutted.

Plaintiff's testimony regarding Lewis's unwelcome post–1981 sexual advances was denied by Lewis.[1] However, when Lewis was questioned about specific incidents of sexual harassment, he testified that he could not recall many particular events. When the Court inquired as to his meaning, Lewis admitted that these episodes may have occurred, although he had no specific recollection of them.[2] In addition, plaintiff's statement that Lewis failed to review her job performance from 1981 through 1984 was uncontested, although Lewis denied that such appraisals were withheld because plaintiff refused his sexual advances. Finally, plaintiff's testimony concerning the psychological effect of Lewis's conduct was largely supported by the testimony of the medical experts and plaintiff's friend at Black Clawson, Susan King. Opposing testimony from one of defendant's experts, Dr. J. Thomas DeVoge, was not credible. Dr. DeVoge testified that even assuming the truth of plaintiff's allegations regarding Lewis's sexual harassment, such abuse had no measurable impact on her psychological condition. He had no opinion as to whether these events, if factual, had any impact on the plaintiff at all. This testimony directly contradicts the opinion evidence of both of plaintiff's psychologists[3] and defendant's other testifying psychologist, Dr. Rick Allgeier. Dr. Allgeier found that Lewis's behavior aggravated plaintiff's pre-existing problems and contributed to her present emotional state. We credit the testimony of the three psychological experts who determined that Lewis's conduct was at least one cause of plaintiff's present emotional distress, and find that this evidence is consistent with plaintiff's testimony.

Plaintiff described the atmosphere at Black Clawson's Middletown facility as pervasively sexual, and her description was corroborated by the testimony of several current or former employees of the defendant company. Witnesses Susan Hall, Charles Beckman, Susan King, Dale Parker, Barbara Tankersley, Betty Blakely and Thomas Moore either related incidents of sexual advances by male managers or reported having heard rumors of male manager-female subordinate affairs within the company. This evidence was rebutted by the testimony of Phyllis Smith, who was not aware of any sexual behavior involving employees at the Middletown plant apart from having heard rumors about the relationship between Lewis and the plaintiff. Smith's testimony, to the extent that is contrary to the evidence of the abovementioned witnesses, is clearly outweighed by their testimony. Further, we note that relations between Smith and the plaintiff were decidedly strained.

---

1. Lewis specifically denied leaving sexual explicit material on plaintiff's desk, asking plaintiff to accompany him to a "dirty movie," complimenting plaintiff on her "build," pulling plaintiff's hair, and "smacking" plaintiff in the face.

2. Lewis admitted that he told plaintiff that he had received a telephone call from six men who wanted to "gang-bang" her, but stated that he told her "in fun." He also admitted telling plaintiff that she should talk to a retiring co-worker because the co-worker was single "and had a lot of money." There were also certain episodes which Lewis "couldn't recall." He couldn't recall commenting about plaintiff's buttocks, he couldn't recall forcibly kissing plain-

tiff, he couldn't recall discussing plaintiff's age in relation to her sexual desire, he couldn't recall commenting on plaintiff's surgery and her ability or inability to have children after the operation and he couldn't recall patting her face.

3. Plaintiff's experts, Dr. Bley and Dr. Olson, testified that Lewis's conduct was the precipitating cause of plaintiff's present emotional distress. They also expressed the opinion that the harassment led to plaintiff's avoidance of and withdrawal from the hostile work place. Further, they supported plaintiff's claim that the stress of her job environment had physical ramifications.

Carl Landegger, president of Black Clawson, also testified that he was unaware of any male manager's involvement with a female subordinate at the Middletown facility. However, because he was not often at the Middletown plant, his testimony is entitled to less weight than that of witnesses who were there on a daily basis. Landegger further testified that such conduct was improbable because management employees knew of his policy prohibiting relationships between male managers and female subordinates. However, the testimony of several Black Clawson managers demonstrates that this policy was not communicated to them. Accordingly, we find that plaintiff's testimony concerning the sexual environment of the Middletown facility is fully supported by the weight of the evidence and is credible.

While listening to plaintiff's testimony and observing her demeanor, particularly during counsel's thorough, searching cross-examination, we were impressed with her perception of what occurred in her life after her relationship with Lewis ended. We find that she was a generally credible witness, and that her testimony was frequently supported by other competent evidence.

Edward Lewis's trial testimony was evasive at critical points and in some instances contrary to his deposition testimony. As mentioned above, he frequently stated that he "could not recall" performing various acts of harassment. However, his later testimony made it clear that those events could have occurred. Consequently, plaintiff's allegations of harassment are largely unrebutted.

Lewis admits that he did not evaluate plaintiff's job performance but claimed that he withheld these appraisals because he did not wish to confront plaintiff about her attendance. This testimony is inconsistent with his actions in sending plaintiff two letters regarding her "attendance problem." Further, Lewis stated that when he told plaintiff that "it doesn't have to be this way," he meant that she would be reviewed if she improved her attendance. This testimony was rebutted by the plaintiff, who understood the remark to mean that she would receive a review and a raise if she submitted to Lewis's sexual advances. We credit plaintiff's testimony on this issue, both because we find her a more credible witness and because Lewis later admitted that attendance has no impact upon whether an employee receives a review. Every Black Clawson manager who testified also stated that regular work evaluations of subordinates are mandatory.

Lewis's trial testimony about his sexual relations with other Black Clawson employees was inconsistent with his deposition testimony denying such affairs. Additionally, the testimony of Thomas Moore, Dale Parker and Carl Landegger shows that Lewis lied to Black Clawson management about his affair with plaintiff. Competent evidence contradicts much of Lewis's testimony and provides ample grounds for the Court to question his veracity. Further, his demeanor and the nature of the allegations made against him support our conclusion that Lewis was not a credible witness.

Carl Landegger, president of the defendant company, testified that Black Clawson had a policy prohibiting sexual harassment. He claimed that the "open-door policy," a letter written by Landegger to all employees instructing them that they could contact him on any personal or divisional matter, addressed sexual harassment. This claim was authoritatively rebutted by Ms. Mary Belfry, a human resources consultant qualified as an expert on corporate policy and procedure concerning sexual harassment. Ms. Belfry concluded that defendant had no policy regarding sexual harassment. She specifically expressed the opinion that the "open-door policy" did not qualify as a sexual harassment policy because it was too broad, it was not adequately communicated to the employees, it did not specifically mention sexual harassment, it did not assure employees that no retaliation would occur, and it was intimidating for lower-echelon women who were harassed by their supervisors to use it because it required them to complain directly to the (male) president. Ms. Belfry stated that a harassed woman could reasonably fail to complain under such circumstances.

Ms. Belfry's conclusions are supported by the testimony of the plaintiff, who stated that she was afraid she would lose her job if she complained about her supervisor. Ms. Susan Hall, a former employee of Black Clawson, also testified that she did not think the open-door policy related to sexual harassment and that she did not use it when male managers made unwanted advances to her. Charles Beckman, one of the defendant's managers, admitted that Black Clawson had no policy concerning sexual harassment. Finally, Carl Landegger admitted on cross-examination that Black Clawson adopted a new policy specifically prohibiting sexual harassment in 1987, and that the policy provided specific mechanism for reporting harassment. The Court recognizes that two employees of Black Clawson, Susan King and Phyllis Smith, testified that they understood that the open-door policy permitted writing to the president regarding sexual harassment. However, after observing Ms. Belfry on the stand and after reviewing her qualifications, we find her testimony concerning Black Clawson's policy on sexual harassment more credible than that of Mr. Landegger, Ms. King and Ms. Smith.

In sum, the Court finds that plaintiff and her witnesses were generally more credible than the defendant's witnesses.

### EEOC Charge

■ We turn now to the threshold question of timeliness. The timely filing of an EEOC charge is a prerequisite to the maintenance of a Title VII action in a United States District Court. *United Airlines, Inc. v. Evans*, 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 1887 n. 4, 52 L.Ed.2d 571 (1977). Under 42 U.S.C. § 2000e–5 (1981), an unlawful employment practice charge must be filed with the Equal Employment Opportunity Commission within three hundred days after the alleged practice occurred. *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). However, if an ongoing pattern of discrimination is alleged, only the last act must occur within the statutory filing period. *Roberts v. North American Rockwell*, 650 F.2d 823, 827–28 (6th Cir.1981); *Curry v. Unit-*

*ed States Postal Service*, 583 F.Supp. 334, 342 (S.D. Ohio 1984). The last act must constitute a present violation of Title VII; it is not sufficient that the effect of an earlier act of discrimination continues into the statutory period. *Evans*, 431 U.S. at 558, 97 S.Ct. at 1889; *Trabucco v. Delta Airlines*, 590 F.2d 315, 316 (6th Cir.1979) (per curiam).

Plaintiff filed her EEOC charge on December 13, 1985. The only incident occurring within three hundred days of that filing was the withholding of a pay increase following her January, 1985 employment anniversary date. Black Clawson's chief financial officer, Mr. Dale Parker, testified that he did not approve the proposed salary increase because he was not satisfied with Edward Lewis's reasons for recommending it. However, Parker also admitted that he rarely "second-guessed" his managers, that he did not conduct an independent investigation to determine why plaintiff was frequently absent, that he did not review plaintiff's personnel file and that he did not attempt to verify the accuracy of Lewis's statement that he had never had a relationship with plaintiff or any other female subordinate at defendant company. Further, although Parker testified that there was no justification for authorizing a token increase in plaintiff's pay, he approved an increase for employee Donald Gerding. Mr. Gerding, a white male whose position and experience was comparable to that of the plaintiff, received authorization from Parker for a $1,700.00 per year increase despite Edward Lewis's statements that Gerding's major weaknesses included "poor communication, documentation; provides no leadership; poor attitude."

Parker's conduct, comments, and his demeanor while testifying indicate that his stated reasons for not approving a modest pay increase to the plaintiff in Spring, 1985 were false and therefore pretextual. *See Sims v. Cleland*, 813 F.2d 790 (6th Cir. 1987) (holding that an employee may establish that the legitimate reason for an employment decision offered by an employer is pretextual by showing by a preponderance of the evidence either that the discrim-

inatory reason was the true reason motivating the employer's conduct or that the proffered legitimate reason was false). We conclude that his action was a continuation of the sexual discrimination experienced by the plaintiff while employed at Black Clawson, and that this action occurred within the statutory period. Accordingly, we find that the plaintiff's EEOC charge was filed in a timely manner.

### Findings of Fact

A clear preponderance of the evidence establishes that plaintiff Barbara K. Shrout, a female, was hired by Black Clawson's Shartle/Pandia Division in Middletown, Ohio in 1976. Black Clawson, an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, had corporate data processing facilities in Middletown. Edward Lewis was Black Clawson's Corporate Director of Data Processing from 1979 through 1985. It was Lewis's responsibility to conduct written performance appraisals and salary reviews of non-exempt data processing personnel. Corporate policy required such evaluations at least annually.

From 1978 until early 1981, plaintiff and Lewis maintained a voluntary, consensual sexual relationship. Because of their relationship, Lewis arranged for plaintiff's transfer from the Shartle Division to the Corporate Division in 1979. He was her direct supervisor. During their relationship, they traveled together on Lewis's business trips and attended company events and other social gatherings. The relationship was common knowledge at Black Clawson's Middletown plant, and other management personnel had heard about it. These managers had also heard rumors concerning other relationships involving Lewis.

Plaintiff terminated the relationship in 1981, although she continued to work under Lewis at the Corporate Data Processing Division. From 1981 to 1985, Lewis attempted to force plaintiff to submit to his sexual advances by withholding performance evaluations and salary reviews. He also harassed plaintiff through this time period because she refused to continue their relationship. Among other things, Lewis made frequent sexual remarks to plaintiff, touched her intimately, left sexual materials on her desk,[4] splashed water on her and "looked down [her] blouse and up [her] skirt."

Black Clawson had no policy regarding sexual harassment during the 1981–85 period. Consequently, plaintiff did not complain to Black Clawson management (except to Lewis) about Lewis's actions. Further, plaintiff justifiably feared disbelief or retaliation in response to any complaint.

At least two of the defendant's upper-management witnesses should have discovered that Lewis was withholding plaintiff's performance evaluations and salary reviews. For a time, Lewis sent his reviews to Thomas Moore, Corporate Director of Employee Relations. Subsequently, Dale Parker received evaluations from Lewis. Neither manager noticed the lack of reviews, and neither investigated it. However, performance reviews were mandatory, and good attendance or performance was not a prerequisite to evaluation.

As a result of Lewis's actions, plaintiff suffered monetary loss and psychological damage. In addition to the mental anguish caused by Lewis's abusive conduct, plaintiff suffered emotional distress due to the withholding of salary reviews and attendant increases.

### Conclusions of Law

Title VII of the Civil Rights Act of 1964 provides in part that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... terms, conditions or privileges of employment, because of such individual's ... sex...." Title VII § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1). Two distinct classifications of sexual harassment have been prohibited under this lan-

---

**4.** Although defendant denied leaving a publication entitled *Sex Over Forty* on plaintiff's desk, employee Donald Gerding testified that he saw Lewis at plaintiff's desk and later that same day saw the literature on her desk. Additionally, Lewis was the addressee of the publication.

guage: harassment that creates a hostile work environment and harassment in which a supervisor demands sexual consideration in exchange for job benefits (also known as *quid pro quo* harassment). Plaintiff claims that she was subjected to both types of harassment, and that under the circumstances of this case such harassment constituted intentional infliction of emotion distress under Ohio law.

### A. *Quid Pro Quo* Harassment

■ To prevail on a claim of *quid pro quo* sexual harassment in this Circuit, a plaintiff must assert and prove

> ... (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

*Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 648 (6th Cir.1986).

It is undisputed that plaintiff, a woman, is a member of a protected class. She was subjected to unwelcome and degrading sexual conduct and remarks, and was refused annual performance appraisals and salary reviews.[5] When plaintiff complained about this harassment to Lewis, he told her that "things don't have to be this way." The harassment which occurred was clearly based upon sex. Plaintiff's refusal to submit to the demands of her supervisor resulted in his continued withholding of performance evaluations and salary reviews, with the result that plaintiff received no pay increases between 1981 and 1985. Finally, respondeat superior liability exists because in a *quid pro quo* action "an employer is held strictly liable for the conduct

of supervisory employees having plenary authority over hiring, advancement, dismissal and discipline...." *Highlander*, 805 F.2d at 648.

The foregoing analysis, based upon our findings of fact, clearly supports the conclusion that plaintiff has proven a cause of action in *quid pro quo* sexual harassment.

### B. Hostile Environment Sexual Harassment

■ In order to pursue a cause of action in a sexual harassment case based upon a sexually hostile or abusive work environment, a plaintiff in this Circuit must assert and prove that:

> ... (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability.

*Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619–20 (6th Cir.1986).

Again, it is undisputed that plaintiff is a member of a protected class. A preponderance of the evidence reflects that plaintiff's supervisor constantly made sexual remarks to plaintiff and frequently subjected her to various types of sexual behavior, including offensively touching her, leaving sexually explicit material on her desk, splashing water on her and looking "down [her] blouse and up [her] skirt." The testimony of other witnesses supports our finding that it was the common and accepted practice of male managers to make sexual remarks

---

**5.** We note that *quid pro quo* claims of sexual harassment may be predicated upon a single incident, although in the present case we find that numerous sexual remarks and offensive

touchings occurred. *See Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620 (6th Cir.1986); *Highlander*, 805 F.2d at 649.

and jokes to female subordinates, who largely felt left to their own devices to quash the unwanted attention. Undoubtedly, this harassment was based upon sex.

The trier of fact must adopt the perspective of a reasonable employee when determining whether harassment unreasonably interfered with plaintiff's work performance and created an intimidating, hostile or offensive working environment that seriously affected the plaintiff's psychological well-being. *Rabidue*, 805 F.2d at 620. From the plaintiff's testimony and the opinion evidence of Dr. Bley and Dr. Olson, we conclude that plaintiff's work performance suffered as a result of the harassment. Both experts testified that the harassment plaintiff endured had physical and psychological consequences, and that these in turn precipitated plaintiff's absences from work.[6] Increased absenteeism was characterized as a typical response to harassment.

The credible evidence also demonstrates that plaintiff's work environment was offensive and intimidating. Plaintiff testified that she found Lewis's conduct offensive, and such testimony was unrebutted. Other witnesses stated that they knew of sexual relationships between co-workers at the Middletown facility or had been subjected themselves to sexual harassment from managers or supervisors. In fact, the record shows that any female subordinate walking in the hallways of the defendant's Middletown facility was likely to be sexually accosted. The atmosphere was characterized as replete with sexual kidding. Any reasonable person, subjected to the harassment that plaintiff suffered, especially within the strongly sexual atmosphere prevalent at the Middletown plant, would have found the plaintiff's working environment intimidating, hostile and offensive.

Employers are not strictly liable for the sexual harassment of their supervisors in a hostile environment case. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). Rather, a court must apply traditional agency principles when determining respondeat superior liability. *Id.; Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir.1987). The relevant question is whether the acts complained of occurred within the scope of the agent's employment. *Yates*, 819 F.2d at 636. Because the harassment took place during working hours, at the office, and was carried out by someone with the authority to hire, fire, promote and discipline the plaintiff, we conclude that Lewis's conduct took place in the scope of his employment.[7] *See id.* Further, there is sufficient evidence in the record to find that Black Clawson management knew or reasonably should have known of Lewis's actions. As the *Yates* court noted, it is easier to impute knowledge to an employer when the harasser was a supervisor. *Id.* Finally, Black Clawson failed to remedy the problem. Therefore, we conclude that plaintiff has proven her charge of hostile environment sexual harassment.

## C. Intentional Infliction of Emotional Distress

Ohio recognizes a cause of action against one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). The *Yeager* court defined "extreme and outrageous conduct" as conduct which "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be re-

---

6. We agree with those courts which have refused to permit employers to base disparate treatment of an employee upon his or her diminished work performance when the employer's acts were a direct cause of that decrease. *See Moffett v. Gene B. Glick Co.*, 621 F.Supp. 244 (N.D.Ind.1985); *Weiss v. United States*, 595 F.Supp. 1050 (E.D.Va.1984).

7. An employer gives its supervisors power over its employees. As stated by Justice Marshall in *Meritor*, "... it is the authority vested in the supervisor by the employer that enables him to commit the wrong; it is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates." *Meritor*, 106 S.Ct. at 2410–11 (Marshall, Brennan, Blackmum and Stevens, J.J., concurring).

garded as atrocious, and utterly intolerable in a civilized community." *Id.* at 375, 453 N.E.2d 666 *quoting Restatement (Second) of Torts* § 46 comment d (1965).[8]

In response to a question from the Court, Ms. Mary Belfry, a human resources consultant qualified as an expert on corporate policy and procedure concerning sexual harassment, gave her professional opinion that the harassment plaintiff experienced was outrageous and beyond all bounds of decency. She based her opinion on her own observations, during the course of business, of the effects of similar harassment on its victims. Ms. Belfry's conclusion was supported by the testimony of the plaintiff and the psychological experts, who described the psychological and emotional injury caused by Lewis's conduct.[9]

Lewis persecuted the plaintiff for four years, ceasing only when plaintiff's EEOC charge was filed. His constant harassment continued despite its obvious effect on plaintiff. As her supervisor, Lewis knew that plaintiff's absenteeism had increased since his actions commenced. Further, plaintiff frequently described to Lewis her anxiety regarding her financial situation, a predicament at least partially caused by Lewis's refusal to perform mandatory salary reviews. Under these circumstances, we conclude that Lewis's harassment constituted extreme and outrageous conduct, and that it caused emotional distress which no reasonable woman could endure. *See Pyle v. Pyle,* 11 Ohio App.3d 31, 463 N.E.2d 98 (1983). Further, as established in the previous section, the defendant is liable for the tort of its supervisor under the theory of respondeat superior. *See Stranahan*

*Bros. Catering v. Coit,* 55 Ohio St. 398, 45 N.E. 634 (1896) (holding that the principal is liable for an agent's acts committed within the scope of the agent's employment).

### Damages

■ Plaintiff may recover back pay in an amount comparable to the salary she would have received but for defendant's unlawful employment practice. Title VII § 706(g), 42 U.S.C. § 2000e–5(g). Back pay liability accrues no more than two years prior to the filing of the EEOC charge. *Id.*

Dale Parker, defendant's chief financial officer (later corporate comptroller) conceded that had plaintiff received all available increases, she would have received an additional $17,000 to $20,000 from 1982 through 1987. Defendant's exhibit AA suggested $17,879 in back pay, while plaintiff's exhibit 47 proposed $20,0555. The Court finds that neither exhibit was fully authenticated or explained by testimony. Given the conflicting evidence on this matter, the Court concludes that a reasonable award of backpay is $17,000.00.[10]

■ Plaintiff is also entitled to compensation for the intentional infliction of emotional distress. In arriving at a reasonable award, the Court considered the duration and intensity of the harassment and the degree of emotional harm suffered by the plaintiff. We conclude that an award of $75,000.00 fairly compensates the plaintiff for her emotional distress. The amount of the settlement between Lewis and the plaintiff, $10,000.00, shall be credited against this award. Ohio Rev.Code Ann. § 2307.32(F)(1).

8. Defendant's argument that the tort of intentional infliction of emotional distress may not arise in the work place is without merit. *Foster v. McDevitt,* 31 Ohio App.3d 237, 511 N.E.2d 403 (1986), the case defendant cites for this proposition, is inapposite. The *Foster* court found that the supervisor's conduct was privileged because, although she caused plaintiff emotional distress, she exercised a legal right to terminate plaintiff's employment. Conversely, there is no legal justification for Lewis's actions in the instant case. Further, we previously decided that developing Ohio case law permits a claim of intentional infliction of emotional distress in the context of an employment relationship. *See Yungkau v. Dean Witter Reynolds, Inc.,* 628

F.Supp. 23 (S.D. Ohio 1985). Defendant has not cited dispositive case law to the contrary, and our research has not disclosed such authority.

9. Three of the four testifying psychologists stated that Lewis's conduct adversely affected the plaintiff. As explained in an earlier portion of this opinion, we do not credit Dr. DeVoge's testimony to the contrary.

10. Unlike the parties' proposed awards, the Court's figure does not include backpay for 1982 or 1983. *See* Title VII § 706(g), 42 U.S.C. § 2000e–5(g).

 Plaintiff is also entitled to punitive damages against defendant. An employer is subjected to punitive damages through the malicious conduct of its employees if the employer has authorized, ratified, participated or acquiesced in the wrongdoing. 39 O.Jur.3d *Employment Relations* § 395 (1982). We find that Lewis's four-year campaign of harassment, continuing even after he observed the effect of his conduct, was malicious and deleterious. In an earlier portion of this opinion, we found that Dale Parker, Lewis's superior, participated in the misconduct directed at the plaintiff. We further concluded that certain of the defendant's high-level managers knew or should have known that Lewis was wrongfully withholding plaintiff's annual performance evaluations and salary reviews. Lewis's failure to appraise plaintiff's work, in addition to the rumors about him circulating among Black Clawson managerial employees, should have prompted his superiors to investigate the situation. However, no action was taken.

Under these circumstances, we conclude that punitive damages against the defendant employer are warranted.[11] Accordingly, exemplary damages are awarded in the amount of $50,000.00.

 Further, equitable relief is appropriate in this case. Section 706(g) of Title VII vests broad equitable discretion in the federal courts to order appropriate affirmative action. 42 U.S.C. § 2000e–5(g); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). It would be unjust to permit defendant to continue plaintiff's salary at a rate resulting from defendant's illegal employment practices. By defendant's estimate, plaintiff's 1987 salary should have been $17,-545.00. Therefore, defendant is instructed to increase plaintiff's salary to this level immediately.

Finally, plaintiff is entitled to interest on the money judgment awarded herein. 28 U.S.C. § 1961.

Judgment is entered in favor of the plaintiff, and damages in the amount of $132,-000.00 plus interest are hereby awarded, being $17,000.00 on her EEOC claim for back wages, $65,000.00 on the pendent state claim and $50,000.00 punitive damages. In addition, equitable relief concerning plaintiff's current salary is granted as detailed above.

---

**11.** See the Court's previous discussion of Black Clawson's respondeat superior liability.