Dorothy MACKEY, Plaintiff–Appellee,

v.

David W. MILAM, Travis Elmore,
and United States of America,
Defendants–Appellants.

No. 97–3859.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1998.

Decided Sept. 10, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 27, 1998.*

Edward Himmelfarb (argued and briefed),
Barbara L. Herwig (briefed), U.S. Dept. of

* Judge Cole would grant rehearing for the reasons    stated in his dissent.

Justice, Civil Div., Washington, DC, for Appellants.

Joanne Jocha Ervin (argued and briefed), Dayton, OH, for Appellee.

Before: KRUPANSKY, SILER, and COLE, Circuit Judges.

SILER, J., delivered the opinion of the court, in which KRUPANSKY, J., joined. COLE, J. (pp. 652–655), delivered a separate dissenting opinion.

## OPINION

SILER, Circuit Judge.

Plaintiff, Dorothy Mackey, initially filed this action in Ohio state court alleging that defendants, David W. Milam and Travis Elmore, her superior officers in the United States Air Force, sexually harassed her. The Department of Justice authorized representation of Milam and Elmore, and the case was removed to federal court with the United States substituted as defendant. The district court, however, determined that under applicable Ohio law, Milam and Elmore were not acting within the scope of their employment when they allegedly sexually harassed Mackey. It therefore rejected substitution of the United States as defendant and remanded the case to the Ohio state court. On the United States's motion, the district court certified its scope of employment decision for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). For the reasons that follow, we find that Milam and Elmore were acting within the scope of their employment and therefore REVERSE the district court's order.

## I.

Mackey was a Captain in the Air Force. Milam and Elmore were her two immediate superior officers during the times in question. Mackey alleges that on several occasions, Milam and Elmore made inappropriate sexual advances toward her.

In her complaint, Mackey states that at their first meeting, Milam locked the door to his office while she was alone with him. He often "ogled" her and made comments when she wore her skirted uniform. He also stood very close to her and inquired about her perfume and make-up. Milam also engaged in "unwanted touching" and made sexual comments in her presence.

Mackey made even more serious allegations against Elmore in her complaint. She alleged that he often stared at her breasts and made comments about her slender waist and her appearance in the skirted uniform. During meetings, he leaned back in his chair so that he could see under the table when she wore her skirted uniform. During one meeting, after Mackey's neck popped, Elmore began massaging her neck. On another occasion, he began touching her ankle and legs after she injured her knee. At another time, he placed his hands around her waist in order to "measure" it. During one meeting, Mackey commented that she was not feeling well. At that point, Elmore began replicating a pelvic exam by moving his hands down Mackey's stomach. Finally, Elmore invited Mackey to a local bar late one evening for the stated purpose of working on her resume. She met him at the bar, but when she started to leave, he initially stopped her and prevented her from entering her car.

Mackey left the Air Force in 1994. She alleges that both Milam and Elmore, who were still on active military duty, subsequently gave unfavorable assessments of her work to prospective employers.

In 1995, Mackey filed a complaint in Ohio state court against Milam and Elmore in their individual capacities, alleging various violations of Ohio common law and of Ohio's civil rights statute. The defendants moved for summary judgment in state court on the basis of intramilitary immunity, but the state court denied that motion.

In the spring of 1996, the Department of Justice authorized representation of Milam and Elmore. The U.S. Attorney filed a certification that the defendants were acting within the scope of their employment under the Westfall Act, 28 U.S.C. § 2679(d)(2). The case was removed to federal court with the United States substituted as defendant. The case therefore became one against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2679(d)(1).

The United States moved to dismiss on the ground that FTCA claims for injuries that arise incident to military service are barred by the *Feres* doctrine. *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

The district court denied the United States's motion to dismiss and rejected the substitution of the United States as defendant. On the scope of employment issue, the court determined that under Ohio law, Milam and Elmore were not facilitating or promoting the business of the United States and were therefore not acting within the scope of their employment. Therefore, Milam and Elmore were not entitled to have the United States substituted as defendant. The court noted that the case had been litigated for some time in state court and remanded the matter with Milam and Elmore resubstituted as defendants.

In response, the United States filed a Rule 59(e) motion to alter or amend the judgment. The court denied that motion in part and granted it in part in an order dated May 23, 1997. The court refused to revise its order concerning the scope of employment issue and rejected the defendants' alternative argument that they were entitled to intramilitary immunity. However, the court did agree that where facts are disputed, the court must hold an evidentiary hearing to determine whether the plaintiff has produced sufficient threshold evidence that the events in question occurred before ruling on the immunity issue. Therefore, the court vacated its earlier order and ordered an evidentiary hearing, as requested by the United States, for the purpose of determining whether there was evidence that the acts alleged by Mackey in her complaint occurred.

The United States appealed and urged this court to take jurisdiction under the collateral order doctrine. It also filed a motion with the district court to certify the scope of employment decision for interlocutory appeal under 28 U.S.C. § 1292(b). The district court granted that motion and framed the question for interlocutory appeal as follows:

"Whether the defendant Air Force officers were acting within the scope of their employment under Ohio law when they allegedly engaged in sexual harassment of the Plaintiff, an Air Force officer who worked for them."

## II.

■ Under 28 U.S.C. § 1292(b), this court may, "in its discretion, permit an appeal to be taken from" an interlocutory order where the district court has certified that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Because we agree with the district court that the scope of employment issue is a controlling question of law and that resolution of the issue would advance the litigation, we take jurisdiction of this appeal under 28 U.S.C. § 1292(b).[1]

## III.

■ A scope certification by the U.S. Attorney pursuant to 28 U.S.C. § 2679(d)(2) "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee," *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995), but "provides *prima facie* evidence that the employee was acting within the scope of employment." *RMI Titanium Co. v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1143 (6th Cir. 1996) (citation omitted). Under the Westfall Act, "[w]hether an employee was acting within the scope of his employment is a question of law ... made in accordance with the law of the state where the conduct occurred." *Id.* This court therefore reviews the district court's determination *de novo*. *Coleman v. United States*, 91 F.3d 820, 823 (6th Cir. 1996).

■ The district court relied primarily upon the Ohio Supreme Court's decision in *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d

1. Defendants also argue that this court would have jurisdiction over this appeal under the collateral order doctrine, even in the absence of the district court's certification. However, we decline to reach that alternative argument.

584 (1991), a case in which a church pastor was accused of engaging in nonconsensual sexual conduct with a member of his congregation. The Ohio court held that the church could not be held liable under a *respondeat superior* theory of liability as the pastor was not acting within the scope of his employment because his behavior was not "calculated to facilitate or promote the business for which the servant was employed." *Id.* at 587 (citation omitted). The district court in this case therefore relied on *Byrd* to hold that Milam and Elmore were acting outside the scope of their employment because sexual harassment did not facilitate the business of the Air Force.

However, the Ohio Supreme Court in a subsequent case made clear that the rationale of *Byrd* did not apply to an employee's sexual harassment of another employee over whom he or she had supervisory power. In *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 575 N.E.2d 428 (1991), the plaintiff alleged that her direct supervisor had sexually harassed her during the course of her employment. The court specifically rejected Porter Paint's reliance on *Byrd* and its argument that it could not be held liable because it did not hire the employee to harass female employees. *Id.* at 432.

> In determining whether to impose liability based on respondeat superior on an employer for the sexually harassing acts of one of its employees, federal courts have employed traditional agency principles. Specifically, they have held that where an employee is able to sexually harass another employee because of the authority or apparent authority vested in him by the employer, it may be said that the harasser's actions took place within the scope of his employment.

*Id.* (citations omitted). Where the harassment takes "place during working hours, at the office, and was carried out by someone with the authority to hire, fire, promote and discipline the plaintiff," it will normally fall within the employee's scope of employment. *Id.* (citation omitted). The *Kerans* court then adopted the above standard, previously applied by federal courts, and held that there was a genuine issue as to the harasser's supervisory powers and that dismissal of the employer was improper. *Id.*

In the instant case, Milam and Elmore had direct supervisory power over Mackey. Most of the alleged acts took place during working hours on the base. Moreover, Milam and Elmore were able to perpetrate the harassment because their employer, the Air Force, had placed them in a supervisory position. Therefore, they were acting within the scope of their employment.[2]

In arguing that Milam and Elmore were acting outside the scope of their employment, Mackey focuses on at least two events that do not precisely fit the above profile. First, she argues that Elmore's harassment of her at a local bar was outside the scope of employment because it occurred off base and after working hours. However, we find that this isolated incident does not take Elmore's actions, as a whole, outside the scope of his employment. He convinced Mackey to come to the bar because he said he wanted to discuss her resume. Thus, it is doubtful that he would have been able to "lure" her to the meeting had he not been in a supervisory position over her.

Mackey also argues that the unfavorable job recommendations given by the defendants after she left the Air Force take their actions outside the scope of her employment because they were no longer her supervisors. However, their opinions were solicited because they had been her supervisors. Therefore, their opinions were given only because the Air Force had placed them in positions of authority. The fact that Mackey was no longer on active duty is irrelevant to the determination.

---

2. The dissent suggests that reliance on *Kerans* is misplaced and that this court should instead rely on *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (1992). In *Osborne*, which dealt with the liability of a police department for the actions of an off-duty officer who assaulted a civilian, the Ohio court stated that, "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Id.* However, that quoted language was taken from *Byrd*, 565 N.E.2d at 588, which the Ohio Supreme Court rejected in cases of sexual harassment of an employee by her supervisor. *See Kerans*, 575 N.E.2d at 432.

We conclude that the individual defendants were acting within the scope of their employment when they allegedly harassed Mackey. Therefore, the United States should be substituted as the defendant in this action, and the matter should not be remanded to the Ohio state court. Under the *Feres* doctrine, "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Mackey's allegations go "directly to the 'management' of the military; [they call] into question basic choices about the discipline, supervision, and control of a serviceman ... and [are], therefore, [ ] allegation[s] about which we are prohibited from inquiring." *Skees v. United States,* 107 F.3d 421, 424 (6th Cir.1997)(citing *United States v. Shearer,* 473 U.S. 52, 58, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985))(internal quotations omitted). *See also Stubbs v. United States,* 744 F.2d 58 (8th Cir.1984)(holding that a claim against the United States for a servicewoman's suicide allegedly caused by her drill sergeant's sexual harassment was barred by *Feres* ).

REVERSED and REMANDED for action consistent with this opinion.

## DISSENT

R. GUY COLE, JR., Circuit Judge, dissenting.

I respectfully dissent from the majority's opinion because I disagree with its reading of Ohio law and conclusion that the conduct alleged in this suit falls within the defendants' scope of employment. Therefore, I do not believe that the United States should be substituted as the defendant in this action.

The majority considers *Kerans v. Porter Paint Co.,* 61 Ohio St.3d 486, 575 N.E.2d 428 (1991), a departure of sorts from the general principles of Ohio law regarding scope of employment, and bases its conclusion in this case on only that one decision. In *Kerans,* the court concluded that a jury could find a store manager's alleged sexual harassment to be within the scope of his employment if the manager had supervisory authority over the plaintiff and used such authority to cause the plaintiff to feel compelled to endure his conduct in order to remain employed. *Id.* at 432. I disagree with the majority's conclusion that *Kerans* is dispositive of the issue presented in this case. The resolution of scope of employment questions varies from case to case; we are not bound by one decision's determination that summary judgment was not warranted in a particular factual circumstance.

Although the majority opinion sets out the basic facts of this case, I have included the district court's synopsis of the facts alleged in the complaint, as it presents a somewhat fuller picture of the conduct and circumstances alleged. As taken from the district court's opinion, the factual scenario is as follows:

After graduating from the University of Akron, Plaintiff, Dorothy Mackey, became a commissioned officer in the United States Air Force. In September 1991, Plaintiff was assigned as Squadron Section Commander at Wright–Patterson Air Force Base (Wright–Patterson) in Dayton, Ohio. In this position, Plaintiff reported to and interacted with the Defendants in this action, Colonel David W. Milam and Lt. Colonel Travis E. Elmore. As Squadron Section Commander, Plaintiff was responsible for the Weight Management Program (WMP) and the Cycle Ergometry Program (CEP), both designed to measure and ensure the physical fitness and readiness of military personnel.

Defendant Colonel Milam, retired, served as Inspector General and Chief of Staff for the Aeronautical Systems Division of Wright–Patterson at the time the alleged incidents occurred. Defendant Lt. Colonel Elmore reported to Colonel Milam. His official title at the time of these incidents was Assistant Chief of Staff for the Aeronautical Systems Division and Assistant Inspector General. Both Defendants were Plaintiff's immediate supervisors.

Plaintiff alleges various instances of sexual harassment against both Defendants while she served as Squadron Section Commander. These allegations include

charges of both verbal harassment and physical contact that, if true, constitute serious misconduct. Specifically, with regard to Colonel Milam, Plaintiff alleges that: (1) While Plaintiff was reporting to Colonel Milam in his office regarding the WMP checks, the Colonel would often close and lock the door behind Plaintiff; (2) During these briefings and on several occasions Colonel Milam would eye Plaintiff from head to toe and make suggestive remarks such as "This is what I prefer"; (3) Colonel Milam would invade Plaintiff's "intimate zone" by standing so close to her as to enable her to feel his breath on her face and neck; (4) Colonel Milam often touched Plaintiff by placing his hand on her hand or squeezing her arm while she briefed him on the WMP program.

Plaintiff's allegations regarding Lt. Colonel Elmore's conduct are even more severe. According to the Complaint, Lt. Colonel Elmore made it clear early on in the relationship that he was interested in Plaintiff's body. He appeared to have had a particular interest in Plaintiff's breasts, even going so far as to comment on one occasion that her erect nipples were "a natural reaction" from the cold. Lt. Colonel Elmore repeatedly made inquiries into Plaintiff's waist size, even taking the liberty of placing his hands around her waist on more than one occasion. Elmore would often make an approving remark such as, "Very nice—very nice," if Plaintiff were wearing her skirted uniform, but Elmore allegedly lost interest if she were wearing the pants uniform. Plaintiff alleges that over time the Lt. Colonel's conduct became increasingly more physical. Elmore once began to massage the back of Plaintiff's neck after it had popped audibly in his presence. One another occasion, after Plaintiff had twisted her right knee and was treated by a physician, Lt. Colonel Elmore took the opportunity to examine the knee himself.

Finally, in a truly bizarre and disturbing event, Plaintiff alleges that Elmore began to replicate a quasi-pelvic exam on Plaintiff while in his office. Plaintiff mentioned to Elmore that she was not feeling well. Lt. Colonel Elmore allegedly got out of his chair, walked over to Plaintiff, and placed both of his hands on her stomach and pressed down. He began to move his hands down the front of her pants, with his thumbs up and fingers wrapped around her back. Elmore continued to move his hands downward, pressing in on Plaintiff's abdomen despite her protests. When the Lt. Colonel got to Plaintiff's pubic area, Elmore said that she should see a physician.

All of Plaintiff's allegations, with the exception of one incident in August 1992, occurred on the military base during working hours. The August incident involved Elmore allegedly calling Plaintiff at her apartment around 10:00 p.m. from an off-base night spot and insisting that she meet him there. Plaintiff agreed to meet Lt. Colonel Elmore after he mentioned that he could review her resume which he had with him. When Plaintiff arrived, Elmore was alone and had placed an order for food. Elmore asked about her neck and back, and he began rubbing his hand up and down her back. Plaintiff claims that on several occasions, his hand dropped below her waist. After refusing Lt. Colonel Elmore's request to dance, Plaintiff claims she attempted to leave, but Elmore physically prevented her from entering her car by leaning against the driver's side door. Thirty minutes later, Elmore finally relinquished, and allowed Plaintiff to drive home alone.

*Mackey v. Milam,* No. C–3–96–140, at 1–4 (S.D.Ohio Dec. 11, 1996).

The majority reasons that Milam and Elmore's actions were within the scope of their employment simply because they had direct supervisory power over Mackey and because most of the incidents occurred during working hours. This reasoning is not supported by Ohio law. In *Kerans,* the decision upon which the majority relies, the Ohio Supreme Court did not hold that a supervisor's sexual harassment of an employee is per se within a supervisor's scope of employment by virtue of a supervisor's ability to sexually harass. Rather, the court held that if a supervisor used his authority to cause the subordinate employee to feel compelled to endure his

advances in order to keep her job, then a jury could reasonably find that the supervisor acted within the scope of his employment. *Kerans*, 575 N.E.2d at 432.[1] The *Kerans* court went on to state that "[e]ven if [the supervisor's] activities took place outside the scope of employment, summary judgment against appellants' claims would not be proper," noting that the employer may be liable for failing to take appropriate action if the employer knows or had reason to know that its employee posed a risk of harm to other employees. 575 N.E.2d at 432. The *Kerans* decision has been characterized as holding that "the torts of co-workers predicated upon sexual harassment are within the scope of employment if the employer was negligent in not preventing that malfeasance." *Baab v. AMR Services Corp.*, 811 F.Supp. 1246, 1267 (N.D.Ohio 1993). Thus, the *Kerans* court did not rely entirely upon the issue of scope of employment to conclude that summary judgment was not warranted in that case.

I do not believe that *Kerans*, or Ohio law in general, suggests that all an employee's acts are within the scope of employment simply because he is in a supervisory position which enables him to engage in tortious conduct. To say such leads to the conclusion that ·innumerable tortious acts committed upon lower-ranking employees by supervisors will be considered within the scope of employment. In my mind, this reasoning and its inevitable conclusion defy common sense. The fact that Elmore and Milam would not have been able to commit the alleged conduct absent their positions as supervisors avoids the question presented. It goes without saying that the conduct would not have occurred if Mackey had not had an association with the defendants by virtue of her employment. Our task is to determine whether these supervisors were acting within their scope of employment when they engaged in the alleged conduct.

In addition, the Ohio Supreme Court has more recently restated its position regarding whether an employee's conduct falls within the scope of his employment, albeit not in the context in which a supervisor was the tortfeasor. *See Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (1992). In *Osborne*, the Ohio Supreme Court explained that in order for an employee's conduct to be considered within the scope of his employment, "the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed....'" 587 N.E.2d at 829 (citations omitted).

> In general, an intentional and willful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment.... Stated otherwise, an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business.

*Id.*(citations and quotations omitted); *see also Henson v. National Aeronautics and Space Administration*, 14 F.3d 1143, 1147 (6th Cir.1994) (stating that under Ohio law, "an employee is not acting within the scope of employment if its acts are self-serving and in no way facilitate or promote business"), *amended on rehearing*, 23 F.3d 990 (6th Cir.1994).

Clearly, the conduct alleged here was intended to neither facilitate nor promote the business of the United States Air Force. The Air Force does not promote, facilitate or condone sexual harassment; in fact, it has promulgated regulations prohibiting such conduct. In *Osborne*, the Ohio Supreme Court offered further guidance, drawing on its long-established precedent. "'When an employee diverts from the straight and narrow performance of his task, the diversion is not an abandonment of his responsibility and service to his employer unless his act is *so divergent that its very character severs the relationship of employer and employee.*'" *Id.* at 829 (citations omitted) (emphasis add-

1. The majority represents that the *Kerans* Court held that when the harassment takes place during working hours, at the office and by someone with the authority to hire, fire, promote and discipline the plaintiff, "it will normally fall within the employee's scope of employment." *See* slip op. at p. 650. The *Kerans* Court did not make that statement. Rather, it summarized a federal district court's decision in which there were such circumstances. *See Kerans*, 575 N.E.2d at 432 (summarizing holding of *Shrout v. Black Clawson Co.*, 689 F.Supp. 774 (S.D.Ohio 1988)).

ed); *Mumford v. Interplast, Inc.,* 119 Ohio App.3d 724, 696 N.E.2d 259, 265 (1997) (stating that "an employee is acting outside the scope of employment where the act has no relationship to the employer's business or is so divergent that its very character severs the employer-employee relationship"). It is clear to me that the nature of the conduct alleged here is so divergent from the defendants' legitimate duties and work activities that it severed the employer-employee relationship between the Air Force and the defendants.

In sum, I believe that the majority improperly extended the holding of *Kerans* and disregarded other Ohio decisions relevant to determining the issue of whether an employee's conduct falls within the scope of his employment. In my view, the majority opinion thus misconstrues Ohio law. The *Kerans* decision, upon which the majority relies, supports the imposition of liability against a negligent employer by considering the employer's potential liability for an employee's actions. Here, the majority's application of *Kerans* provides for the opposite result. By considering the defendants' actions to fall within the scope of their employment, the majority enables the defendants, as well as their employer—the United States—to escape liability because the United States is immune from suit. Plaintiff is thus left without a remedy for the egregious actions of the defendants. I do not believe that Ohio law can be construed to permit such an inequitable result. In my opinion, the defendants' conduct was plainly a personal deviation and not within the scope of their employment as defined by Ohio law. As a result, the United States should not be substituted as the defendant in this action. I would therefore affirm the district court's reinstatement of Milam and Elmore as defendants in this action.