Edward MARTINEK, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C–3–00–252.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 7, 2003.

Carla J. Morman, David Carr Greer, Bieser, Greer & Landis, Dayton, OH, for Plaintiffs.

Pamela M. Stanek, United States Attorney's Office, Dayton, OH, for Defendant.

EXPANDED OPINION SETTING FORTH THE REASONING AND CITATIONS OF AUTHORITY FOR SUSTAINING THE MOTION OF THE UNITED STATES TO DISMISS, PURSUANT TO FED. R. CIV. P. 12(B)(1), FOR LACK OF SUBJECT MATTER JURISDICTION (DOC. #19); JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFFS; TERMINATION ENTRY

RICE, Chief District Judge.

This litigation arises out of the limitation of Major Edward Martinek's medical privileges at the Wright Patterson Medical Center ("WPMC"), and the sending of correspondence to the Ohio State Medical Board, which reported that Dr. Ann Marie Martinek had improperly performed an invasive medical procedure at WPMC.[1] At the time of the events underlying this lawsuit, Plaintiff Edward Martinek, M.D., was a Major in the United States Air Force, assigned to WPMC at Wright Patterson Air Force Base.[2] Major Martinek specializes in radiology. His wife, Plaintiff Ann Marie Martinek, M.D., is also a medical doctor, who specializes in ophthalmology; she is not, and has never been, a member of the armed services.

On July 19, 1998, Major Martinek performed a percutaneous transepatic cholangiogram and attempted to perform a percutaneous transepatic biliary drainage procedure at WPMC. Dr. Ann Marie Martinek was present during the procedure, and she participated to a minor extent.[3] No adverse outcome resulted from Dr. Martinek's assistance. While investigating unrelated allegations of improper fraternization, Major Martinek's supervisor, Colonel Kevin Voss, M.D., the Medical Director of Diagnostic Imaging Flight, became aware of Dr. Martinek's participation in the July 19, 1998, procedure, and he began an investigation of that incident. On August 11, 1998, Colonel Voss spoke with and typed a witness statement for Sergeant James K. Thompson, the radiology technologist who was present during the biliary drainage procedure. After he was asked to provide more details, a revised statement, dated August 12, 1998, was typed for Sergeant Thompson. Colonel Voss subsequently took administrative action to remove Major Martinek from the interventional radiology suite.

After obtaining the witness statements from Sergeant Thompson, Colonel Voss contacted Colonel Kathleen S. Bohanon, M.D., the Chief of the Medical Staff, regarding the situation. Colonel Bohanon discussed the situation with Brigadier General Joseph E. Kelley, the Medical Facility Commander ("MFC") of WPMC (Bohanon Depo. at 50–52), who, in turn, discussed it with Lieutenant General Raggio, the Aeronautical Systems Center ("ASC") Commander. Because General Raggio wanted to court martial Major Martinek for his conduct (Bohanon Depo. at 51), they decided to refer the matter to the Air Force Office of Special Investigations ("OSI"), as a criminal matter for dereliction of duty (id. at 51, 55). Ultimately, Major Martinek received an Article 15 non-judicial punishment in lieu of court-martial for that incident.

---

1. Because both Plaintiffs are properly identified as Dr. Martinek, the Court will refer to Edward Martinek as "Major Martinek" and to Ann Marie Martinek as "Dr. Martinek."

2. The following undisputed facts are taken from the evidence submitted by the parties.

3. The parties dispute the extent of Dr. Martinek's participation. However, the uncontroverted evidence indicates that Dr. Martinek had contact with catheters and guide wires during the procedure.

On August 20, 1998, Colonel Bohanon notified Major Martinek that his clinical privileges were being held in abeyance, and that he would be restricted from performing vascular and interventional radiology. In addition, as Chairperson of the Credentials Function Committee, she called a meeting of that committee to review Major Martinek's privileges at the hospital. On October 2, 1998, the Credentials Function Committee met, attended by Colonel Bohanon, Colonel Voss, Colonel Thomas O'Donnell, Lieutenant Colonel Steven L. Chambers, Captain John Soave (Medical Law Consultant), and Ms. Jackie Walker (Credentials Manager). Because Lieutenant Colonel Chambers and Colonel O'Donnell had not heard about the situation, Colonel Bohanon described what had occurred on July 19, 1998. The only information that she had concerning the incident was the OSI witness statements and Sergeant Thompson's statements. Colonel Bohanon indicated that the committee was not questioning Major Martinek's technical competence. Rather, only his professional behavior and "competence to follow the rules of the hospital that were maintained to establish safe patient care" were at issue. Colonel Voss participated in the Credentials Committee's review of Major Martinek's conduct. He told members of the committee that, regardless of whether they took any privileging action, he was going to see to it administratively that Major Martinek did not get back into interventional radiology at the WPMC (Voss Depo. at 147–48). He stated that he "had" Major Martinek and he was going to keep him out of his specialty until he got out of the Air Force (*id.* at 152), despite the fact that Voss agreed that Major Martinek was technically competent. The Committee voted to require that Major Martinek have supervision by another privileged radiologist for certain procedures.

On October 16, 1998, Major Martinek was notified by Colonel Bohanon that his clinical privileges would be automatically suspended. Colonel Bohanon further submitted letters to Riverside Hospital in Columbus, Ohio, and the Veterans Administration Medical Center in Dayton, Ohio, notifying them that Major Martinek's privileges had been limited. Plaintiff appealed the suspension, and on November 6, 1998, Major Martinek was notified that the Credentials Hearing Committee would conduct a hearing on his permitting his wife to participate in an invasive clinical procedure, and on other occasions of alleged unprofessional conduct. In February of 1999, that Committee recommended that, due to Major Martinek's errors in judgment, his privileges should be limited by requiring that all interventional procedures be supervised by another privileged radiologist.

Major Martinek was honorably discharged from the Air Force on June 29, 1999, after completing four years of military service (Doc. # 30, Ex. C). On November 15, 1999, the limitation of Major Martinek's privileges was overturned on appeal by the Air Force Medical Operations Agency ("AFMOA"). Because Major Martinek had already separated from the Air Force, his privileges were not reinstated. Major Martinek petitioned the Air Force Board for Correction of Military Records, requesting that any indication that he had his privileges restricted be deleted, that his non-judicial punishment be set aside, and that his Officer Performance Report for the period June 3, 1998, through June 2, 1999, be declared void. On July 19, 2002, the Board granted his request in its entirety, reasoning that Colonel Voss had a personal vendetta against Major Martinek and that Colonel Voss' bias impacted the non-judicial punishment and the Officer Performance Report (Doc. # 30, Ex. C).

With regard to Ann Marie Martinek, Colonel Bohanon sent a letter to the State

Medical Board of Ohio, accusing her of practicing invasive radiology during a procedure at WPMC. After an investigation, the Medical Board took no action against her.

On April 18, 2000, the Martineks filed suit against Colonels Voss and Bohanon in the Montgomery County Court of Common Pleas, setting forth claims of tortious interference with their professional relationships (Counts One and Three) and loss of consortium (Counts Two and Four) (Doc. # 1). The United States Attorney subsequently certified that Colonels Voss and Bohanon were acting within the course of their employment with regard to the conduct alleged in the Complaint (*id.*). On May 17, 2000, the United States removed the litigation to this Court.

Pending before the Court is the Motion of the United States to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), or, in the alternative, for Summary Judgment (Doc. # 19). In its Motion, the government has asserted numerous grounds for dismissal of each claim. With regard to Edward Martinek's tortious interference with business relations claim (Count One), it argues that the claim is barred, due to (1) the intra-military immunity doctrine, (2) the *Feres* doctrine, and (3) the intentional tort exception for interference with contract rights. The government argues that Ann Marie Martinek's claim must be dismissed (Count Three), due to (1) the intentional tort exception for interference with contract rights; (2) the discretionary function exception; and (3) Ohio Rev.Code § 4731.22(f)(1). In addition, the government asserts that both Plaintiffs' loss of consortium claims (Counts Two and Four) must be dismissed, because their underlying claims are not viable.

In response to the Motion of the United States, the Martineks have argued that the government was improperly substituted for Colonels Voss and Bohanon as Defendant, because those individuals were not acting within the scope of their employment. Plaintiffs argue that the *Feres* doctrine applies only to claims under the Federal Torts Claims Act ("FTCA") and, therefore, it is not applicable to the state law claims against Voss and Bohanon individually. Dr. Ann Marie Martinek further asserts that Ohio Rev.Code § 4731.22(f)(1) does not shield Colonel Bohanon from liability, because she failed to conduct a good faith investigation into the incident. In addition, both Plaintiffs assert that, because their state law claims against Colonels Voss and Bohanon survive, their loss of consortium claims also remain.

On September 24, 2001, the Court issued an Opinion, sustaining Defendant's Motion, treated in part as a Motion to Dismiss for want of this Court's subject matter jurisdiction, under Fed.R.Civ.P. 12(b)(1), and in part as one for summary judgment. In this Expanded Opinion, the Court will set forth the reasoning and citations of authority for the dismissal of this action. Upon review of the relevant case law, the Court now concludes that Plaintiffs' claims must be dismissed, in their entirety, for want of subject matter jurisdiction. As a means of analysis, the Court will first address whether the United States was properly substituted for Colonels Voss and Bohanon, following which it will turn to the parties' arguments regarding the alleged grounds for dismissal.

I. *Substitution of the United States as Defendant*

When reviewing whether the substitution of the United States as Defendant is proper, the central issue before the Court is whether the individually-named federal Defendants, *i.e.*, Colonels Voss and Bohanon, acted within the scope of their federal employment when they engaged in the acts forming the factual basis for the Martineks' Complaint. If so, the United States properly substituted itself as the

Defendant. 28 U.S.C. § 2679(d)(2). This issue is not mooted by the fact that the United States Attorney has certified that Colonels Voss and Bohanon were so acting, or by the substitution of the United States of America as the Defendant. Although the United States Attorney's Certification is conclusive for purposes of removal, it does not conclusively establish as correct the substitution of the United States as defendant in place of the individual federal employees. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). A plaintiff may still challenge the propriety of the certification and the substitution of the United States for the named defendants. *Id.* If the plaintiff's challenge is successful, the individual federal defendants would be resubstituted as the defendants, and the suit would proceed against them in their individual capacity in federal court, subject to a review of the court's subject matter jurisdiction. *See id.* at 434–36, 115 S.Ct. 2227. The Certification itself serves as *prima facie* evidence that Colonels Voss and Bohanon's conduct was within the scope of their employment for the purposes of substituting the United States as defendant. *E.g., RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1143 (6th Cir.1996).

When challenging a certification decision, a plaintiff must present evidence from which a district court reasonably could find that the original defendant-employee acted *outside* the scope of his employment. As noted above, the government's Certification serves as *prima facie* evidence that an employee acted *within* the scope of his employment. Therefore, if the United States substitutes itself as the defendant and moves to dismiss, a plaintiff cannot defeat the motion merely by relying upon the factual allegations in his complaint. *Rutkofske v. Norman,* 114 F.3d 1188, 1997 WL 299382 (6th Cir.1997); *Singleton v. United States,* 277 F.3d 864, 870–71 (6th Cir.2002). A plaintiff may defeat a motion to dismiss, however, by providing the district court with evidence that raises a genuine issue of material fact on the scope-of-employment issue. *Rutkofske,* 114 F.3d 1188, 1997 WL 299382 at *4. The Court may consider such evidence without converting the motion to dismiss into a motion directed to the merits of the litigation, *i.e.,* one for summary judgment. When a plaintiff produces admissible evidence controverting the government's certification decision, a district court must conduct an evidentiary hearing in order to determine whether the United States properly substituted itself as the defendant and removed the plaintiff's lawsuit from state court. *Id.* (reasoning that an evidentiary hearing on the scope-of-employment issue is necessary only when the record contains conflicting evidence with respect to a material fact); *Singleton,* 277 F.3d at 870; *see also Heuton v. Anderson,* 75 F.3d 357, 361 (8th Cir.1996) (holding that when the scope-of-employment issue is disputed, district courts must conduct an evidentiary hearing). Of course, no evidentiary hearing on the certification issue is necessary "where even if the plaintiff's assertions were true, the complaint allegations [or the plaintiff's evidence] establish that the employee was acting within the scope of his/her employment." *RMI Titanium Co. v. Westinghouse Electric Corp.,* 78 F.3d 1125, 1143 (6th Cir.1996).[4]

▪ For purposes of certification and substitution, the issue of whether a federal

---

**4.** If a plaintiff "pleads conduct within an individual's scope of employment and merely alleges bad or personal motive, summary dismissal of the scope challenge is warranted." *RMI Titanium Co. v. Westinghouse Electric*

*Corp.,* 78 F.3d 1125, 1143–1144 (6th Cir. 1996). "The scope of employment issue does not focus on the alleged wrongful nature of the employee's actions; rather, the issue is

employee acted within the scope of her employment is governed by state law. *Woods v. McGuire,* 954 F.2d 388, 390 (6th Cir.1992). In the present case, the conduct at issue occurred at Wright Patterson Air Force Base in Dayton, Ohio. Consequently, the Court looks to Ohio law to determine whether Colonels Voss and Bohanon acted within the scope of their employment when they performed the acts giving rise to the Martineks' Complaint.

■ "Under Ohio law, the scope-of-employment determination turns on whether the employee acts within his authority, even if intentionally or maliciously, during the course of his employment." *Gilbar v. United States,* 229 F.3d 1151, 2000 WL 1206538 (6th Cir.2000); *see RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1143 (6th Cir.1996) ("Under Ohio law, an employee acts within the scope of his employment if the employee acts within his authority during the course of employment even though acting intentionally or maliciously."). An employee acts within the scope of her employment if her conduct: (1) is of the kind which she is employed to perform; (2) occurs substantially within the authorized limits of time and space; and (3) is actuated, at least in part, by a purpose to serve the employer. *Anderson v. Toeppe,* 116 Ohio App.3d 429, 436, 688 N.E.2d 538, 543 (1996). On the other hand, an "intentional and willful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from employment and his principal or employer is not responsible therefore." *Byrd v. Faber,* 57 Ohio St.3d 56, 59, 565 N.E.2d 584, 587 (1991); *Henson v. NASA,* 14 F.3d 1143, 1147 (6th Cir.1994). "An employer is not liable for the independent acts of employees that in no way facilitate or promote the employer's business." *Anderson,* 688 N.E.2d at 543. Thus, in determining whether an employee acted within the scope of his employment, the court must not focus on the alleged wrongful nature of the employee's actions; "rather, the issue is the actions complained of and whether those actions are so divergent that [their] very character severs the relationship of employer and employee." *RMI Titanium,* 78 F.3d at 1144 (citing *Osborne v. Lyles,* 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (1992)); *Gilbar,* 229 F.3d 1151, 2000 WL 1206538 at *8; *Cooper v. Grace Baptist Church,* 81 Ohio App.3d 728, 737, 612 N.E.2d 357 362 (1992).

In *Byrd v. Faber,* 57 Ohio St.3d 56, 565 N.E.2d 584 (1991), the Ohio Supreme Court held that a church could not be held liable under the doctrine of *respondeat superior* for its pastor's alleged nonconsensual sexual contact with a member of his congregation. The Court stated that the pastor was not acting within the scope of his employment, because his behavior was not "calculated to facilitate or promote the business for which the servant was employed." Later that same year, the Ohio Supreme Court made clear that the *Byrd*'s rationale did not apply to situations where a supervisor sexually harasses a subordinate employee. *Kerans v. Porter Paint Co.,* 61 Ohio St.3d 486, 575 N.E.2d 428 (1991). The Court stated that where a supervisor's harassment of an employee takes "place during work hours, at the office, and was carried out by someone with the authority to hire, fire, promote and discipline the plaintiff," it will normally fall within the supervisor's scope of employment. *Id.* at 432.

In *Mackey v. Milam,* 154 F.3d 648 (6th Cir.1998), the Sixth Circuit applied the

the actions complained of and whether those actions are 'so divergent that [their] very character severs the relationship of employer and employee.' " *Id.* at 1144, quoting *Osborne v. Lyles,* 63 Ohio St.3d 326, 330, 587 N.E.2d 825, 829 (1992).

*Kerans* standard to a sexual harassment case involving military servicepeople. Therein, the plaintiff, a servicewoman, alleged that she had been sexually harassed by her superiors. The plaintiff alleged that her superiors made inappropriate sexual advances; ogled her; made sexual comments about her appearance; touched her inappropriately; and after meeting at a local bar, prevented her from leaving. The district court, following *Byrd*, held that the plaintiff's supervisors exceeded their authority, and therefore, rejected the government's substitution as defendant. The Sixth Circuit reversed, reasoning that the defendants had direct supervisory control over the plaintiff. The court of appeals noted that most of the harassment took place during work hours on the base, and that they were able to perpetrate the harassment, because the Air Force had placed the individual defendants in a supervisory position. The Sixth Circuit therefore held that the defendants had acted within the scope of their employment, and the United States should be substituted for them.

More recently, in *Singleton v. United States*, 277 F.3d 864 (2002), the Sixth Circuit, again applying Ohio law, addressed whether a superior officer acted within the scope of his employment when he allegedly engaged in a continuous course of harassment and discrimination. Therein, the plaintiff, Singleton, had alleged that Hitzeman ridiculed, harassed, and discriminated against him on the basis of his personality, lifestyle, and job performance. The court of appeals rejected Singleton's argument that his superior exceeded the scope of his employment, reasoning:

> Other than a general complaint of "a continuing pattern of ridicule, harass-

ment and discrimination," the tortious conduct Singleton alleges in his complaint appears to have occurred within the scope of Hitzeman's employment. J.A. at 12 (Compl.). Singleton claims that Hitzeman attempted to have Singleton removed from his job, filed false and degrading reports against him, punished him for pursuing his legal rights, and leaked confidential information about him. Even if true, these actions appear to have been taken within Hitzeman's authority as Singleton's superior officer during the course of employment; no fact that Singleton alleges would sever the relationship between employer and employee.

277 F.3d at 871.

### A. Colonels Voss and Bohanon's Actions Regarding Major Edward Martinek

In their memorandum, Plaintiffs argue that the actions of Colonels Voss and Bohanon, as set forth in the credentials hearing transcript and in their deposition testimony, cannot be said to have facilitated or promoted the business of the United States Air Force. They assert that Colonel Voss had a personal vendetta against Major Martinek, and that his actions were motivated solely by his desire to hinder Major Martinek's career. As discussed, *infra*, in light of the Sixth Circuit's recent authority on this issue, this Court concludes that actions of Colonels Voss and Bohanon fell within the scope of their employment.

Beginning with Colonel Voss, Plaintiffs have provided substantial evidence that Voss had a great deal of animosity toward Major Martinek, and that he sought to hinder Major Martinek's career within the military.[5] Major Carl Black, a supervisor

---

**5.** Col. Voss testified in his deposition that he did not have a personal dislike for Dr. Martinek and that he never had any personal ani-

mosity toward him (Voss. Depo. at 10, 23). For purposes of this Decision, the Court will construe the evidence in the light most favor-

and quality assurance monitor, testified that the relationship between Colonel Voss and Major Martinek was "strained" and that it "was clear ... that there was not a warm relationship between the two of them." (p. 160–61). In his affidavit, Dr. Michael V. Beheshti, former Chief of Vascular and Interventional Radiology at WPMC, stated:

> After Col. Voss became Commander, Diagnostic Imaging Flight, it became obvious to me that Col. Voss had a strong personal dislike for [Major] Dr. Martinek. In fact, it appeared that he had a personal vendetta against Dr. Martinek. Several times Col. Voss told me that "he would do anything he could to get Dr. Martinek." He indicated that he believed that Dr. Martinek was NOT "Air Force material", and he ask[ed] me to watch Dr. Martinek "like a hawk" in order to try to catch him doing something improper.

(Beheshti Aff. ¶ 10). According to Dr. Beheshti, in June of 1997, Colonel Voss coerced him to alter his Field Grade Officer Performance Report ("OPR") to indi-cate that Major Martinek did not meet the professional qualities standard and that he was deficient in his interaction with superiors. Voss himself admitted that he intended to restrict Major Martinek's ability to practice interventional radiology, regardless of the Credentials Function Committee's actions.[6]

Plaintiffs allege that Colonel Voss' conduct constituted violations of AFI 44–119 §§ 1.18, 1.19, 4.18, and 3.22.3. Section 1.18 sets forth a noninclusive list of the types of incidents which would warrant the use of a medical incident investigator, an investigator from outside the medical treatment facility ("MTF"), such as WPMC. One example is "[t]hose incidents where a full objective evaluation cannot be completed internally in the MTF." 44–119 § 1.19 sets forth the requirements of a Medical Incident Investigator, to ensure that the investigator is impartial and qualified. AFI 44–119 § 3.22, concerning provider privileging, states: "Privileges are based upon education, training, experience, health status, demonstrated current clinical competence, professional behavior, and certifying

---

able to Plaintiffs, and accept that such animosity existed.

6. In their supplemental filing (Doc. # 30), Plaintiffs have provided the decision of the Air Force Board for the Correction of Military Records, in which the Board concluded:

> While it cannot be determined with any certainty, the Board is persuaded that the applicant's commander, who was the Commander of the Diagnostic Imaging Flight, initiated action which ultimately led to the Article 15 and the applicant's loss of medical privileges. Equally apparent, this individual had a personal vendetta against the applicant. Although the commander did not initiate or impose the nonjudicial punishment, the applicant provides sufficient documentation which shows to our satisfaction, that the commander was apparently biased against the applicant and the treatment room incident provided an impetus for him to find a way to limit the applicant's career advancement.

(Doc. # 30, Ex. C at 4). In its Opposition Memorandum (Doc. # 32), the government argues that the AFBCMR decision is not admissible under Fed.R.Civ.P. 56, because the Board did not unequivocally find that Colonel Voss had a personal vendetta against Major Martinek. The government further argues that the Board decision was not made within the context of "scope of employment," and no consideration was given to Ohio law. Although the decision demonstrates that another reviewing party has concluded that Colonel Voss had a personal vendetta against Major Martinek, the Court concludes that it adds little, if anything, to the evidence regarding Colonel Voss' motivations. Plaintiff has al-ready provided substantial evidence that Colonel Voss was motivated by animosity toward Major Martinek. Accordingly, consideration (or not) of the Board decision does not affect the Court's analysis.

examination. The amount and quality of supervised clinical practice should be considered when awarding privileges." Section 3.22.3 provides that "[c]redentialing and privileging is not a discipline mechanism and will not be used as punishment for activities unrelated to clinical practice. It is a program for continually monitoring and assessing the performance of providers using the results of QI/RM activities. However, the MFC must review acts of provider misconduct to determine if the provider's scope of practice should be limited." Section 4B concerns adverse actions hearing procedures. 44–119 § 4.18 sets forth requirements to ensure that the persons who review privileges are impartial. It states that the following personnel should not ordinarily serve on a hearing committee: subordinates of the provider, the individual who suspended the provider's privileges, a person who investigated the case, and a person whose testimony plays a significant part of the case. In support of their Motion, Plaintiffs argue that Colonel Voss, as Major Martinek's supervisor, was not an impartial participant on the committee, and that his participation in the proceedings violated military regulations.

At the outset, the Court notes that "an employee's noncompliance with his or her employer's manual or guidelines is not … wholly dispositive of the issue regarding whether the employee was acting outside the scope of employment." *Davis v. The May Department Stores Co.,* 2001 WL 1148054 (Ohio App. 9 Dist. Sept. 26, 2001). For example, in *Davis, supra,* an Ohio court of appeals addressed whether security personnel for Kaufmann's department store had acted within the scope of their employment with respect to a suspected shoplifter, a minor female. Therein, the agents repeatedly questioned the plaintiff without ever asking for preliminary information, such as her name and age, and without contacting her parents. Believing that she had hidden the supposedly missing clothing under her own clothes, the agents requested the assistance of a female security officer, implicitly requesting a strip search.

Kaufmann's argued that it should not be responsible for the security officers' actions, because they acted contrary to the guidelines it had promulgated regarding the apprehension of shoplifters in various scenarios, including fitting room cases. The guidelines provided in part that "[t]he arrest of a subject for shoplifting based on activity conducted in the fitting room is a situation that must be handled with strict adherence to arrest guidelines." Strip-searching a suspected shoplifter was expressly forbidden.

The court of appeals disagreed with Kaufmann's, reasoning that the evidence indicated that the security officers were acting for the benefit of Kaufmann's. In particular, the male security officers were employed by Kaufmann's, were on-duty at the time of the incident, and were surveilling the shopping area for shoplifters. Moreover, one officer acknowledged that he had detained the plaintiff to ascertain whether she had stolen certain items from the store. The female officer likewise testified that she was acting on behalf of Kaufmann's and was attempting to ascertain whether the plaintiff had hidden stolen items underneath her clothing when she searched her. The court therefore concluded that, by preventing losses caused by shoplifting, the agent/employees' conduct was clearly designed to promote and facilitate Kaufmann's business, despite the fact that some of the officer's actions were contrary to Kaufmann's policies. Thus, even if Colonel Voss acted contrary to Air Force regulations, that fact does not establish that he acted outside the scope of his employment.

In the present case, there is no evidence that Colonel Voss violated AFI 44–119 §§ 1.18, 1.19, 3.22.3, or 4.18. The decision to initiate a medical incident investigation ("MII") rests with the Medical Facility Commander, which in this case was General Kelley. Colonel Voss was neither authorized to initiate an MII, nor was he appointed an MII investigator by General Kelley.[7] In addition, although Colonel Voss participated in the Credentials Function Committee meeting, there is no evidence that he participated in the subsequently-held hearing. Moreover, Colonel Voss did not make the decision to suspend Major Martinek's privileges. That decision also rested with General Kelley.

As for Colonel Voss' actions toward Major Martinek, even construing Plaintiffs' evidence in the light most favorable to them, that evidence is insufficient to create a genuine issue of material fact on whether Voss acted within the scope of his employment. As in *Singleton, supra,* all of the relevant conduct occurred at WPMC during work hours. Colonel Voss was able to obtain witness statements, to raise Major Martinek's behavior with the Chief of Staff, to limit his ability to perform interventional radiology at WPMC, and to participate in the credentialing committee meetings *due to his position as Chief of Radiology.* In other words, all of Colonel Voss' conduct occurred due to his supervisory relationship to Plaintiff. With regard to Colonel Voss' participation in the credentialing decision, Colonel Bohanon indicated that "the joint commission is very specific that the chiefs of clinical services must be involved with credentialing decisions." (Bohanon Depo. at 101). She further stated in her deposition that the due process part of the credentialing decisions does not occur until the provider requests

a hearing (*id.* at 101–02), and "that's the way the structure is set up according to the Air Force Instruction so it—in fact made perfect sense to have the department chairman involved with making a decision about credentialing action on one of his people who was going to work in his department." (*id.* at 101). Thus, his participation was a direct result of his being Major Martinek's department supervisor. Even accepting that Colonel Voss had a strong personal dislike for Major Martinek and was looking for an excuse to reprimand him, none of Major Martinek's allegations sever Colonel Voss' employment relationship with the United States Air Force. Rather, Colonel Voss' alleged conduct, even assuming that it contravened Air Force regulations and was motivated (at least in part) by animosity, was taken within the scope of his supervisory relationship with Major Martinek. Moreover, although Plaintiffs have provided evidence that Colonel Voss seized an opportunity to limit the career of someone he considered to be "not Air Force material," Colonel Voss has indicated that his actions were based on his concern for patient care. Accordingly, the Court concludes that Colonel Voss acted within the scope of his employment. The substitution of the United States for Colonel Voss was, therefore, appropriate.

■ Turning to Colonel Bohanon's conduct, Plaintiffs assert that Colonel Bohanon's decision to bring Major Martinek before the Credentials Function Committee was outside the scope of her employment, because that action was in contravention of Air Force Instruction 44–119 § 4.1. AFI 44–119 § 4.1 provides, in pertinent part: "In the event a particular provider's care is determined to be the cause

---

**7.** Colonel Bohanon indicated that General Kelley opted not to appoint an investigating officer, reasoning that since the OSI was already investigating, she could use the information from the OSI investigation.

of poor outcomes, abeyance or suspension actions may or may not be appropriate, depending on the extent of the problems, the provider's culpability and effort to correct them, and the remedial action required." Plaintiffs interpret this provision as requiring that the provider's care be the cause of a poor outcome before credentials can be at issue. Plaintiffs have provided evidence that Colonel Bohanon has acknowledged that disciplinary issues are not the purview of the credentials function, unless it affects patient care (Bohanon Depo. at 107). Plaintiffs therefore argue that because there was no allegation that Major Martinek had poor outcomes, the credentials hearing was used for punishment, in contravention of § 4.1, and it did not serve any interest of WPMC. Thus, Colonel Bohanon could not have acted within the scope of her employment. Plaintiffs further argue that she did not act in the interests of the military, because any concerns about Major Martinek's conduct had been previously addressed through Colonel Voss' administrative action and through the Article 15 non-judicial punishment.

In the present case, the undisputed evidence indicates that Colonel Bohanon acted with the intention of benefitting the Air Force. She testified that she initially looked into whether there was an adverse outcome to the patient from the bile drainage procedure and whether the patient's consent form indicated that Dr. Martinek would be involved in the procedure (Bohanon Depo. at 56). She stated that she was concerned about the Major Martinek's behavior:

> [T]he fact that this guy had let an unprivileged provider come in and—basically—play around with one of our patients and that—was behavior that in fact we—were—at that point not certain whether there was criminal action that would be taken against either of the Martineks, her for trespassing or as-

sault, him for—gross stupidity is not a crime but some kind of action.

(Bohanon Depo. at 57). Colonel Bohanon indicated that she felt that there had been significant deviations from the acceptable standard of care (id. at 58), an issue which is of primary concern to her as Chief of the Medical Staff.

Furthermore, Colonel Bohanon took steps to ensure the propriety of her actions. Prior to instituting the privileges hearing, she discussed the situation with Brigadier General Kelley, the Medical Facility Commander ("MFC") (Bohanon Depo. at 50–52). Before taking any action on privileging, Colonel Bohanon again talked with Colonel Voss, Brigadier General Kelley, and the medical law consultant. She stated: "I always talk to General Kelley before [putting privileges in abeyance] and so our feeling was that [Major Martinek's] privileges should be played in abeyance until such time as we had the report back from the OSI and had the chance to then make a formal recommendation as far as whether any action should be taken." (Bohanon Depo. at 52).

In addition, there is no evidence that Colonel Bohanon acted with any animosity or personal motivations, i.e., "to vent her own spleen." To the contrary, Dr. Martinek testified that he had no interaction with Colonel Bohanon, other than her signing bonus papers, prior to this incident. (Tr. p. 349). When asked if he was aware of any motives that she might have to hurt him, Major Martinek replied, "No, I'm not." (id.).

In sum, even if Colonel Bohanon acted inappropriately by instituting a privileging action regarding Major Martinek, there is no evidence that she acted outside the scope of her employment. Rather, the evidence establishes that she acted in the interests of the United States Air Force, and that she attempted to ensure that her

actions were appropriate by consulting with her superior officer, the medical law consultant, and Major Martinek's supervisor. Because Colonel Bohanon acted within the scope of her employment with regard to Major Martinek, the substitution of the United States was proper.

### B. Colonels Voss and Bohanon's Actions Regarding Dr. Ann Marie Martinek

■ According to Plaintiffs, Colonel Bohanon wrote to the State Medical Board of Ohio and accused Dr. Ann Marie Martinek of practicing invasive radiology during a procedure at WPMC. Plaintiffs assert that Colonel Bohanon's actions exceeded the scope of her authority, because AFI 44–119 § 6.10 provides that the Commander of Air Force Medical Operations Agency has sole responsibility for reporting to regulatory agencies outside of the Air Force.

Section 6.10, entitled Responsibilities in Reportable Acts states that AFMOA has sole responsibility for reporting to regulatory agencies outside of the Air Force. Section 6.10.1 indicates that AFMOA should notify all states of known licensure, the National Practitioners Data Bank, and other professional regulatory authorities when certain events occur, including, *inter alia*, the medical provider separates or retires; has his or her privileges limited, denied or revoked; voluntarily surrenders his clinical privileges while under investigation for issues of competency, or is permanently removed from patient care due to substandard performance. In his Declaration, Brigadier General Kelley indicated that the Air Force Instructions do not address the issue of whether a civilian should be reported to the Ohio State Medical Board (Kelley Decl. ¶ 13). Although not explicitly stated, General Kelley indicates that section 6.10 applies only to persons who have clinical privileges with the Air Force.

As Chief of the Medical Staff and Chairperson of the Credentials Function Committee, Colonel Bohanon's job focused on the quality of the provision of clinical services, and making certain that the staff who had privileges were exercising those privileges in accordance with accepted standards of medical practice (Bohanon Dep. at 33–34). As stated by Colonel Bohanon, her job involved ensuring patient safety (*id.* ¶ 72). Although Dr. Ann Marie Martinek was not in the Air Force and was not on staff at WPMC,[8] her participation in a medical procedure at WPMC fell within the purview of Colonel Bohanon's responsibilities as Chief of Medical Staff.[9]

In addition, prior to taking any action regarding Dr. Martinek, Colonel Bohanon consulted with numerous individuals within the Air Force to determine whether she, as opposed to AFMOA, could report Dr. Martinek's actions to the Ohio State Medical Board. Brigadier General Kelley stated that Colonel Bohanon discussed with him whether Dr. Martinek should be reported to the Medical Board, and he responded that, because the regulation did

---

**8.** It is undisputed that Dr. Ann Marie Martinek does not have medical privileges at WPMC.

**9.** Although Plaintiffs assert that Ann Marie Martinek was merely an observer, the evidence clearly indicates that she participated in the bile drainage procedure. Sergeant Thompson indicates in both of his witness statements and in the hearing transcript that Dr. Martinek held wires, and that "she was basically doing on this procedure ... what a technologist would do." (Tr. at 21). It is further undisputed that Dr. Martinek scrubbed prior to the procedure, which suggested to Colonel Bohanon that she intended to participate in the procedure. Colonel Bohanon testified that "most physicians do not scrub on procedures that [they are] observing if—unless they know they have to get into the sterile field and touch things." (Bohanon Depo. at 62–63).

not address this issue, she should contact the Surgeon General's Office for their recommendation (Kelley Aff. ¶ 13). Colonel Bohanon testified that she communicated with Colonel Molly Hall, head of the Clinical Quality Division of the Air Force Medical Operations Agency ("AFMOA"), as well as the Surgeon General's Office generally (*id.* at 125, 127).[10] Colonel Bohanon testified that she was told that because the AFMOA had no control over Dr. Martinek, Colonel Bohanon "was fully authorized to report her to the State Medical Board." (*Id.* at 125). Colonel Bohanon further testified that she consulted with Captain Soave, a USAF medical law attorney, about whether she could file a complaint with the State Medical Board, and that Captain Soave helped her draft the letter (*id.* at 129). After consulting with these individuals, Colonel Bohanon then contacted the Ohio State Medical Board about Dr. Ann Marie Martinek's conduct. Based upon the substantial evidence in the record, the Court concludes that Colonel Bohanon was authorized by the USAF to contact the State Medical Board of Ohio regarding Dr. Ann Marie Martinek and, therefore, she was acting within the scope of her employment when she sent correspondence to that entity.

Turning to Colonel Voss, there are no allegations in the Complaint that link Colonel Voss to the decision to send correspondence regarding Dr. Martinek to the Ohio State Medical Board, nor is there any evidence that Colonel Voss played a role in the decision to send same. Plaintiffs' sole allegations with regard to Dr. Ann Marie Martinek relate to Colonel Bohanon's actions in sending that correspondence. Accordingly, Plaintiff has failed to provide evidence that Voss' actions in this

regard were outside the scope of his employment. Accordingly, the substitution of the government for Voss and Bohanon with respect to Dr. Ann Martinek's claim for tortious interference with business relationships was proper.

In summary, the Court concludes that both Colonel Voss and Colonel Bohanon were acting within the scope of their employment, with regard to both Plaintiffs' claims for tortious interference with business relationships. Accordingly, the United States was properly substituted for these individual defendants.

## II. *Plaintiffs' FTCA Claims*

■ Having concluded that Colonels Voss and Bohanon were acting within the scope of their employment and, therefore, that the United States is the proper Defendant herein, the Court must determine whether Plaintiffs' claims must be dismissed, pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. A suit against the United States may only proceed if the government has waived its sovereign immunity. The sovereign immunity of the United States is generally waived with respect to tort actions, pursuant to the waiver contained in the Federal Tort Claims Act (FTCA). *See* 28 U.S.C. § 2674; *see also United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The general waiver, however, is subject to the exceptions contained in 28 U.S.C. § 2680. Section 2680(h) excludes any claim arising out of interference with present or future contract rights. Interference with business relationships falls within this exclusion. *Ongaro v. R.E.B.L. Development, Inc.,* 988 F.2d 121, 1993 WL 39313, *1 (9th Cir.1993) (plaintiff's "claim

---

**10.** According to AFI 6.10, the AFMOA is the reporting authority for all reports made to regulatory bodies with the exception of the National Practitioner Databank. According to Colonel Bohanon, the AFMOA is part of the Surgeon General's Office (Bohanon Depo. at 78).

against the government was for tortious interference with a business relationship, which is explicitly excepted from the FTCA under section 2680(h)"); *Cooper v. American Automobile Ins. Co.,* 978 F.2d 602, 613 (10th Cir.1992)(claims that the actions of the government had resulted in the cancellation of a contract to sell the business and the loss of future business opportunities was barred by § 2680(h)); *Small v. United States,* 333 F.2d 702, 704 (3d Cir.1964) ("The exemption extends not only to an action for the unlawful interference with existing contracts but also to actions for the unlawful interference with prospective contractual relations."); *Chen v. United States,* 854 F.2d 622, 628 n. 2 (2d Cir.1988); *Downie v. City of Middleburg Hts.,* 76 F.Supp.2d 794, 800 (N.D.Ohio 1999); *Compton v. Cohen,* 2001 WL 869648, *2 (N.D.Tex. June 6, 2001). As explained by the Court of Appeals for the District of Columbia:

> The duty that the [defendant] allegedly breached is the duty not to interfere with [plaintiff's] economic relationship with third parties. That duty is the same as the duty underlying a claim for interference with contract rights; the claims are distinguished only because the plaintiff's rights or expectancies under the latter are secured by an existing contract. To hold that interference with prospective advantage does not arise out of interference with contract rights under section 2680(h) would subject the government to liability if its employees interfered with the plaintiff's mere expectation of entering a contract, but not if they interfered with a contract already in existence. Such a result would be illogical and contrary to the " 'words and

reason of the exception.' " We therefore hold, as has nearly every court that has addressed this issue, that [plaintiff's] claims for interference with prospective advantage are barred as claims arising out of interference with contract rights.

*Art Metal—U.S.A., Inc. v. United States,* 753 F.2d 1151, 1154–55 (D.C.Cir.1985) (citations and footnote omitted). Because Plaintiffs' claims for tortious interference with business relationships fall within the exception to the FTCA's waiver of sovereign immunity, Plaintiffs' claims must be dismissed for want of subject matter jurisdiction.[11] Plaintiffs' derivative claims for loss of consortium must also be dismissed.

For the foregoing reasons, Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment (Doc. # 19), treated as a motion to dismiss, pursuant to Rule 12(b)(1), is SUSTAINED.

Judgment will be entered in favor of the Defendant and against the Plaintiffs.

WHEREFORE, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

11. Because Plaintiffs' claims fall within the exception to the FTCA's waiver of sovereign immunity and must be dismissed on that basis, the Court need not address Defendant's additional bases in support of its Motion.