[Cite as *Townsend v. Kettering*, 2022-Ohio-2710.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| DARRIN TOWNSEND | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29376 |
| | : | |
| v. | : | Trial Court Case No. 2019-CV-2924 |
| | : | |
| CITY OF KETTERING, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 5th day of August, 2022.

. . . . . . . . . .

JOHN R. FOLKERTH, JR., Atty. Reg. No. 0016366, 3033 Kettering Boulevard, Point West II, Suite 111, Dayton, Ohio 45439
        Attorney for Plaintiff-Appellee

DAWN M. FRICK, Atty. Reg. No. 0069068 & JAMES M. SCHIRMER, Atty. Reg. No. 0101271, 8163 Old Yankee Street, Suite C, Dayton, Ohio 45458
        Attorneys for Defendants-Appellants

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Fire Chief Thomas Butts and Assistant Chief Michael Miller appeal from a judgment of the Montgomery County Court of Common Pleas, which denied their motion for summary judgment on Darrin Townsend's race discrimination and retaliation claims on sovereign immunity grounds. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} Townsend, an African-American, has been employed by the Kettering Fire Department (KFD) as a firefighter/paramedic since 2003. In 2016, KFD had a fire captain vacancy. Seven Kettering firefighters, including Townsend, applied for the position. The candidates were ranked based on their cumulative score on five weighted components: (1) a written examination; (2) an assessment center score; (3) administrative review (AR) points; (4) seniority points; and (5) annual performance evaluation (APE) points. The written examination and assessment center evaluation were administered by individuals independent of KFD, and Townsend agrees that KFD had no control over those components, which were worth a possible maximum of 100 points. The APE score, worth up to 10 points, was based on past performance evaluations, and the AR score, worth up to 20 points, was assigned by the fire chief based on "information from the administrative review process, oral boards, [the chief's] own review of evaluations and his personal knowledge of the candidates[.]"

{¶ 3} Based on the candidate's total scores, Townsend ranked second on the 2016 captain vacancy promotion list, behind Shawn Morgan, who is Caucasian.

| Name | Written Exam (40%) | A.C. (60%) | Weighted Combined (Max 100) | A.R. Score (Max 20) | Seniority (Max 10) | APE (Max 10) | Total (Max 140) | Rank |
|------|------|------|------|------|------|------|------|------|
| Morgan | 82.58 | 86.5 | 84.932 | 14.222 | 10 | 8 | 117.154 | 1 |
| Townsend | 80.65 | 95.2 | 89.38 | 11.000 | 9.4 | 6 | 115.78 | 2 |
| E.H. | 82.58 | 86.0 | 84.632 | 18.000 | 6.1 | 7 | 115.732 | 3 |
| M.D. | 91.61 | 80.0 | 84.644 | 15.888 | 6.4 | 6 | 112.932 | 4 |
| J.M | 71.61 | 82.5 | 78.144 | 13.333 | 10 | 7 | 108.477 | 5 |
| J.W. | 84.52 | 79.5 | 81.508 | 14.111 | 6.7 | 6 | 108.319 | 6 |
| K.H. | 80.65 | 78 | 79.06 | 13.222 | 6.4 | 6 | 14.682 | 7 |

In accordance with KFD policy, Chief Butts interviewed the three highest-scoring candidates on the promotion list, and he had the discretion to choose from among those individuals which candidate to promote. Butts selected Morgan, who was ranked number one on the list, for promotion to captain.

{¶ 4} According to Townsend, Chief Butts, Assistant Chief Miller, and the City (collectively, "the Kettering Defendants") discriminated against him by underrating his performance on his annual performance evaluations and by preventing him from participating in projects to reduce his chances of promotion. He asserts that when he applied for promotion to the vacant captain position in 2016, the Kettering Defendants "fabricated performance issues against him to demonstrate that he was unfit for command and to justify their decision to give him a low Administrative Review score." Memo in Opp. to Summary Judgment ("Memo in Opp."), p. 1.

{¶ 5} Following the selection of Morgan for promotion, Townsend filed a complaint with the Ohio Civil Rights Commission, claiming race discrimination in the promotion

process. Townsend asserts that the Kettering Defendants subsequently retaliated against him "by including fabricated performance deficiencies in his 2016 annual performance evaluation * * * based upon racial stereotypes to punish and humiliate him for filing the OCRC." Memo in Opp. p. 2.) When three more captain vacancies arose in 2017, KFD promoted Townsend and two others to captain. Townsend maintains that his 2017 promotion was an effort by the Kettering Defendants to conceal their prior unlawful discrimination and retaliation against him. Memo in Opp., p. 2. He emphasizes that the Kettering Defendants had previously evaluated him to be unfit for command, and there had been no changes in his performance between 2016 and 2017.

{¶ 6} The Kettering Defendants dispute that they engaged in discriminatory and retaliatory conduct in the promotion process; they assert that they followed the KFD policy.

{¶ 7} On June 21, 2019, Townsend brought suit under R.C. Chapter 4112 against Butts, Miller, and the City of Kettering, alleging "discrimination based on denial of training, project and overtime opportunities and failure to promote because of race, and reprisal for EEO activity." Complaint ¶ 1, 5. The gravamen of his complaint was that the City racially discriminated against him by not promoting him to a fire captain position in 2016. Townsend alleged that Butts and Miller aided and abetted the City in its discriminatory and retaliatory conduct and that all defendants acted "intentionally, recklessly and maliciously."

{¶ 8} The Kettering Defendants moved for summary judgment, claiming that Townsend's discrimination and retaliation claims failed as a matter of law. Butts and

Miller further asserted that they were entitled to immunity under R.C. 2744.03(A)(6). They argued that (1) they were acting within the scope of their employment, (2) there was no evidence that they acted maliciously or recklessly, and (3) the Revised Code did not expressly impose liability on them as aiders and abettors, because their actions were not unlawful. The Kettering Defendants supported their motion with the transcript of Townsend's deposition and Butts's affidavit. After the trial court granted him additional time for discovery pursuant to Civ.R. 56(F), Townsend opposed the motion, supported by his own affidavit, the affidavit of former KFD firefighter/paramedic April Stapleton, several deposition transcripts, and additional documentation. The Kettering Defendants filed a reply memorandum.

{¶ 9} On January 7, 2022, the trial court overruled the summary judgment motion in its entirety, concluding that genuine issues of material fact precluded summary judgment in the Kettering Defendants' favor on the discrimination and retaliation claims. The trial court further denied Butts's and Miller's assertion of sovereign immunity, finding that two statutory exceptions to immunity applied. As to the first exception to immunity, the court reasoned: "Given that this Court finds that there is a genuine issue of material fact as to whether Defendants discriminated or retaliated against Townsend and it is unlawful for an employer to require its employees to participate in illegal acts, Defendants cannot logically claim that the alleged discrimination and retaliation is within the scope of their employment." As to the second exception, the court held:

Second, while Defendants argue that discrimination and retaliation do not rise to the level of "acts or omissions made with malicious purpose,

in bad faith, or in a wanton or reckless manner," this Court notes that other Ohio Appellate Courts disagree. *See Holmes v. Cuyahoga* [*Community*] *College*, 8th Dist. Cuyahoga No. 109548, 2021-Ohio-687, ¶¶ 42-47, 169 N.E.3d 8 (holding that when racial discrimination and retaliation is disputed, it is appropriate to defer a finding of immunity for an employee of a political subdivision because such actions may later qualify as an exception to immunity); *see also Defs.' Motion*, at p. 18-19. Consequently, pending a jury determination on the discrimination and retaliation claims, the two exceptions specified under R.C. 2744.03(A)(6) may remove Defendants' immunity.

Summary Judgment Decision, p. 13-14. The trial court did not address whether a statute imposed liability on Butts and Miller.

{¶ 10} Butts and Miller appeal from the trial court's denial of summary judgment on their claim of immunity.

## II. Scope of Appeal

{¶ 11} "The general rules regarding final appealable orders in multiparty and/or multiclaim cases involve the tandem of R.C. 2505.02(B) for substance and Civ.R. 54(B) for procedure. A court first applies R.C. 2505.02(B) to determine whether the order 'affects a substantial right and whether it in effect determines an action and prevents a judgment.' If the court of appeals determines that the trial court order is final under R.C. 2505.02, the next step is to determine whether the trial court certified the order with the language of Civ.R. 54(B) —'there is no just reason for delay.' The use of Civ.R. 54(B)

certification by a trial court is discretionary." (Citations omitted.) *Sullivan v. Anderson Twp.*, 122 Ohio St.3d 83, 2009-Ohio-1971, 909 N.E.2d 88, ¶ 10.

{¶ 12} "The denial of summary judgment generally is not a final, appealable order." *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 11. In this case, the trial court's decision denying summary judgment on the merits of Townsend's discrimination and retaliation claims was not a final appealable order, as those claims have not been reduced to judgment. *See Coterel v. Reed*, 2016-Ohio-7411, 72 N.E.3d 1159, ¶ 8 (2d Dist.).

{¶ 13} However, R.C. 2744.02(C) provides that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." A summary judgment ruling that denies a claim of alleged immunity is a final appealable order under R.C. 2744.02(C). *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, syllabus. Such a ruling is immediately appealable even without certification under Civ.R. 54(B) that "there is no just cause for delay." *Sullivan* at syllabus. Chief Butts's and Assistant Chief Miller's appeal from the denial of their motion for summary judgment on sovereign immunity grounds is properly before us.

{¶ 14} In their appellate briefs, the parties have provided detailed statements of fact, which outline the evidence in support of their positions regarding the merits of Townsend's discrimination and retaliation claims. However, our review of the trial court's order denying Butt's and Miller's claim of immunity is limited to the portion of the trial court's order addressing the issue of immunity. *See, e.g., Vlcek v. Chodkowski*, 2015-

Ohio-1943, 34 N.E.3d 446, ¶ 35 (2d Dist.); *Guenther v. Springfield Twp. Trustees*, 2012-Ohio-203, 970 N.E.2d 1058 ¶ 24 (2d Dist.).   We cannot review other aspects of the trial court's summary judgment decision, namely its rulings on Townsend's claims themselves, and our opinion has no bearing on those pending claims.

### III. Summary Judgment Standard

{¶ 15} "The review of a summary judgment denying political-subdivision immunity is de novo and is governed by the summary-judgment standard set forth in Civ.R. 56." *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 13.

{¶ 16} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party.   *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998).   The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated.   *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988).   To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment.   *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).   The substantive law of the claim or claims being litigated determines whether a fact is "material."   *Perrin v. Cincinnati Ins. Co.*, 2020-Ohio-1405, 153 N.E.3d 832, ¶ 29 (2d Dist.).

{¶ 17} Once the moving party satisfies its burden, the nonmoving party may not

rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Dresher* at 293. Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 18} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012-CA-18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine all the Civ.R. 56 evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

## IV. Sovereign Immunity

{¶ 19} The Ohio immunity statute, R.C. 2744.03, creates a presumption of immunity for official government acts carried out by political subdivisions and their employees. *Coterel,* 2016-Ohio-7411, 72 N.E.3d 1159, at ¶ 14, citing *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (1st Dist.1995). There are three exceptions to this general grant of immunity for governmental employees: (1) the employee's acts or omissions were manifestly outside the scope of employment; (2) the employee's acts or omissions were with malicious purpose, bad faith, or in a wanton or reckless manner, or (3) civil liability is expressly imposed upon the employee by a section of the Revised Code. R.C. 2744.03(A)(6)(a)-(c). It is undisputed that Chief Butts and Assistant Chief Miller are employees of a political subdivision.

**A. Scope of Employment under R.C. 2744.06(A)(6)(a)**

{¶ 20} Butts and Miller first challenge the trial court's conclusion that genuine issues of material fact precluded a finding that Butts and Miller had acted within the scope of their employment under R.C. 2744.06(A)(6)(a).

{¶ 21} The sovereign immunity statute does not define what conduct is "manifestly outside the scope of employment" under R.C. 2744.03(A)(6)(a).   However, Ohio courts have often held that "conduct is within the scope of employment if it is initiated, in part, to further or promote the master's business."   *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, 179 N.E.3d 687, ¶ 80 (2d Dist.), quoting *Jackson v. McDonald*, 144 Ohio App.3d 301, 307, 760 N.E.2d 24 (5th Dist.2001).   "For an act to fall within the scope of employment, it must be calculated to facilitate or promote the business for which the [employee or agent] was employed." (Citations omitted.) *Johnson v. Godsey*, 2d Dist. Clark No. 2012-CA-80, 2013-Ohio-3277, ¶ 32.   "In general, if an act is committed within the scope of employment, it will be authorized, either expressly or impliedly, by the employer."   (Citations omitted.)   *Coterel* at ¶ 17.

{¶ 22} "In the context of immunity, '[a]n employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take the act manifestly outside the scope of employment.' " *Jackson* at 307, quoting *Elliott v. Ohio Dept. of Rehab. & Corr.*, 92 Ohio App.3d 772, 775, 637 N.E.2d 106 (10th Dist.1994). Only when the employee is motivated by actual malice or other situations giving rise to punitive damages will the employee's conduct be outside the scope of employment. *Coterel* at ¶ 17.   "The act must be so divergent that it severs the employer-employee

relationship." *Elliott* at 775.

{¶ 23} Whether an employee acted within the scope of employment generally is a question of fact to be decided by the jury. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶ 16. In discrimination claims particularly, "the determination of whether conduct is within the scope of employment or outside the scope of employment necessarily turns on the fact-finder's perception of whether the supervisor acted, or believed himself to have acted, at least in part, in his employer's interests." *Id*. at ¶ 17, citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152 (3d Cir.1999), fn. 6. "Only when reasonable minds can come to but one conclusion does the issue regarding scope of employment become a question of law." *Osborne v. Lyles*, 63 Ohio St.3d 326, 330, 587 N.E.2d 825 (1992).

{¶ 24} In the context of a sexual harassment claim, the Ohio Supreme Court has rejected the notion that harassment by a supervisor necessarily falls outside the scope of employment. *Kerans v. Porter Paint C*o., 61 Ohio St.3d 486, 575 N.E.2d 428 (1991); *Harrison*. In *Kerans*, the employer argued that because it did not hire the supervisor to sexually harass female employees and because the supervisor's actions in no way facilitated the employer's business, the employer could not be held liable for the harm that resulted from the supervisor's egregious behavior. In finding that genuine issues of material fact existed as to whether the supervisor acted within the scope of employment, the supreme court noted federal case law which recognized that "where an employee is able to sexually harass another employee because of the authority or apparent authority vested in him by the employer, it may be said that the harasser's actions took place within

the scope of his employment." (Citations omitted.) *Id.* The Court cited *Shrout v. Black Clawson Co.*, 689 F.Supp. 774 (S.D.Ohio 1988), in which the district court held that "[b]ecause the harassment took place during working hours, at the office, and was carried out by someone with the authority to hire, fire, promote and discipline the plaintiff, * * * [the harassing employee's] conduct took place in the scope of his employment." *Kerans* at 490, citing *Shrout* at 781.

{¶ 25} The United States Supreme Court also has provided examples of discriminatory behaviors by supervisors that fall within the scope of employment versus "frolics" or "detours" from the scope of employment. *See Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1997). Discussing Title VII of the Civil Rights Act of 1964, it stated:

> [T]here is no reason to suppose that Congress wished courts to ignore the traditional distinction between acts falling within the scope and acts amounting to what the older law called frolics or detours from the course of employment. Such a distinction can readily be applied to the spectrum of possible harassing conduct by supervisors, as the following examples show. First, a supervisor might discriminate racially in job assignments in order to placate the prejudice pervasive in the labor force. Instances of this variety of the heckler's veto would be consciously intended to further the employer's interests by preserving peace in the workplace. Next, supervisors might reprimand male employees for workplace failings with banter, but respond to women's shortcomings in harsh or vulgar terms. A

third example might be the supervisor who, as here, expresses his sexual interests in ways having no apparent object whatever of serving an interest of the employer. If a line is to be drawn between scope and frolic, it would lie between the first two examples and the third, and it thus makes sense in terms of traditional agency law to analyze the scope issue, in cases like the third example, just as most federal courts addressing that issue have done, classifying the harassment as beyond the scope of employment.

*Faragher* at 798-99.

{¶ 26} Turning to the case before us, we disagree with the trial court to the extent it implied that discriminatory and retaliatory conduct can never fall within the scope of employment simply because discrimination and retaliation in employment is illegal. Significantly, there is no genuine issue of material fact that Butts and Miller each were acting in a supervisory capacity when they evaluated Townsend's performance as a firefighter/paramedic. As part of the 2016 promotion process, administrative review rating sheets (ARRS) were sent to the candidates' immediate supervisor and battalion chief to complete, and then the fire chief met with each of those supervisors to review the ARRS for all of the candidates. Miller, who was then a battalion chief, prepared an ARRS for Townsend. Chief Butts, along with a different assistant chief, conducted interviews of the candidates, and he assigned an AR score.

{¶ 27} Although Townsend has alleged his AR score was artificially low due to racial bias by Butts and Miller, there is no genuine issue of material fact that they completed their evaluations as part of their supervisory duties in the 2016 promotion

process and their actions were, at least in part, for the benefit of the KFD. Butts's and Miller's acts thus were not outside the scope of their employment. Accordingly, we conclude that the trial court erred in determining that their immunity was removed because genuine issues of material fact existed as to whether they acted "manifestly outside the scope of their employment."

### B. Intent under R.C. 2744.06(A)(6)(b)

{¶ 28} Chief Butts and Assistant Chief Miller next assert that the record did not establish that their actions were done with malicious purpose, in bad faith, wantonly, or recklessly.

{¶ 29} "For the purposes of R.C. 2744.03, 'malice' refers to 'the willful and intentional desire to harm another, usually seriously, through conduct which is unlawful or unjustified.' " *Reno v. Centerville*, 2d Dist. Montgomery No. 20078, 2004-Ohio-781, ¶ 25, quoting *Moffitt v. Litteral*, 2d Dist. Montgomery No. 19154, 2002-Ohio-4973, ¶ 96. "Bad faith" has been defined as a "sinister motive that has no reasonable justification," and "wanton" conduct implies a failure to exercise any care. *Moffitt* at ¶ 96. "Reckless" conduct is "conduct that causes an unreasonable risk of harm." *Id.* These terms represent distinct standards of care and are not interchangeable. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 31.

{¶ 30} In general, an employee's entitlement to immunity under R.C. 2744.03(A)(6) is a question of law. *Doe v. Greenville City Schools*, 2021-Ohio-2127, 174 N.E.3d 917, ¶ 12. However, the underlying issue of whether the employee acted maliciously, in bad faith, or in a wanton or reckless manner is generally a question of fact. *Id.*, citing *Pendry*

*v. Troy Police Dept.*, 2d Dist. Montgomery No. 28531, 2020-Ohio-3129, ¶ 13. "Thus, a trial court may not grant summary judgment on the basis of * * * [R.C.] 2744.03(A)(6)(b) immunity unless reasonable minds can only conclude that the employee did not act willfully, wantonly, maliciously, reckless[ly], or in bad faith." *Pendry* at ¶ 13, quoting *Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192, 103 N.E.3d 1, ¶ 38 (4th Dist.).

{¶ 31} "The standard for showing that a political subdivision employee acted with malicious purpose, in bad faith, or in willful, wanton, or reckless manner is 'rigorous' and will in most circumstances be difficult to establish." *Hoffman*, 2017-Ohio-9192, 103 N.E.3d 1, at ¶ 39; *see Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 8; *McDonald v. Lacy*, 2d Dist. Montgomery No. 27779, 2018-Ohio-2753, ¶ 26. Consequently, summary judgment is appropriate if the employee's conduct does not, as a matter of law, rise to the level of maliciousness, bad faith, wantonness, or recklessness. *Id*.

### 1. Assistant Chief Miller

{¶ 32} Miller was hired by KFD as a firefighter/paramedic in October 1993. Upon his promotion to battalion chief, Miller became Townsend's supervisor for the December 1, 2015 to November 30, 2016 rating period. Miller was promoted to assistant chief in August 2018, after the events at issue in this litigation occurred.

{¶ 33} In her affidavit, fellow firefighter April Stapleton indicated that it was well known that Miller disliked Townsend, and she heard from KFD coworkers that Miller had made racial comments to Townsend. Stapleton Aff. ¶ 3; *see* Morgan Depo 23. According to Stapleton, Miller's comments included telling Townsend that he did not

believe white families should adopt black babies and that he did not swim at public pools because black people swam there. *Id.*; Townsend Depo. 89, 98. Townsend similarly stated that, in 2003 or 2004, Miller told him that white families should not adopt black babies. Townsend Depo. 98-99. Morgan (who received the promotion to captain in 2016) heard from Stapleton about Miller's comment regarding the pool. Morgan Depo. 21.

**{¶ 34}** According to Townsend, while he was studying materials for the promotion tests in 2016, Stapleton told him that Miller said he (Townsend) would never be promoted no matter how well he scored on the promotion list. Townsend Aff. ¶ 9; Townsend Depo. 60. Stapleton and Morgan both had heard about Miller's statement from coworkers, and Stapleton told Townsend about it. Stapleton Aff. ¶ 8; Morgan Depo. 22. Stapleton described Townsend as disappointed to hear what Miller had said, but he was "very aware that management was opposed to him being promoted to Captain and would try to prevent him from achieving this goal." Stapleton Aff. ¶ 8.

**{¶ 35}** As Townsend's supervisor, then-Battalion Chief Miller completed an administrative review rating sheet (ARRS) as part of review process for the vacant captain position and submitted it to Chief Butts. Miller Depo. 8. (Miller was also Morgan's supervisor and completed an ARRS for him.) Miller had numerous criticisms of Townsend, including, but not limited to: (1) does not always following department and city policy and procedures closely; (2) additional schooling and study were not in fire department-related fields until recently; (3) can react in anger when stressed; (4) demonstrates ability to gain trust and respect of peers and supervisors mainly with his

crew, not all firefighters, and does not trust supervisors; (5) not always clean, neat, and professional (being corrected); (6) does not admit uncertainty and does not lead by example; (7) not open-minded, not flexible, and does not promote new ideas; (8) did not cope well with news of getting a new battalion chief; (9) does not develop solutions to departmental problems; (10) does not accept responsibility; (11) currently not involved in any projects; (12) slow to action; (13) not always a team player; (14) is "last in, first out [at EMS scenes], stands back, hones in on past police training, not nursing"; (15) paperwork is incomplete or wrong at times; (16) can be considered unfriendly during EMS emergencies; and (17) does not communicate with supervisors. Miller Depo. 71-76. (Miller quoted his ARRS comments during his deposition, but the document itself was not filed with the deposition.) Chief Butts and Assistant Chief Miller discussed the ARRS Miller prepared for Townsend, but Miller did not recall the substance of the conversation. Miller Depo. 8.

{¶ 36} The day after his interview with Chief Butts, Townsend spoke with Miller in an effort to learn what things Miller saw that Townsend could improve upon in his job performance. Miller responded, in part, that Townsend needed to trust people more; he was not seen as a team player. Townsend concluded there was not much he could change, because the issue primarily was administration's (Butts, Miller, and others) perception of him. Townsend Depo. 85-86.

{¶ 37} After Morgan was promoted to the vacant captain position, Stapleton noticed that management "had become more openly hostile toward Capt. Townsend." Stapleton Aff. ¶ 10. Miller completed Townsend's 2016 annual performance evaluation

on November 25, 2016. Townsend Depo., Ex. F. Section II of the form addressed position performance factors for firefighters, and Miller selected one of five rankings (outstanding (O), above standards (A.S.), meets standards (M.S.), below standards (B.S.), and unsatisfactory (U)) and provided comments for each factor, as follows:

| Factor | Rank | Comment |
|---|---|---|
| Job Knowledge | A.S. | Darrin has taken several Fire Department and Fire Officer related classes during this rating period including Pro Board Fire Officer I, II, III, and is currently enrolled in Fire Officer IV. He has taken Blue Card, is enrolled in Fire Instructor, is an ACLS instructor, a BLS instructor, has taken a Building Construction class, has attended a Fire Safety Officer class, and EMS Safety and Survival Class. He also attended a three day supervisory training class. |
| Quality of Work | M.S. | Darrin needed to be reminded a few times during this rating period to "move with a purpose" in order to improve upon his response times. Darrin also moves slowly at emergency scenes. I encourage Darrin to move faster during emergency calls. |
| Quantity of Work | M.S. | Although Darrin has an advanced education in the Fire Service, he hasn't taken on any departmental projects during this rating period.   I encourage Darrin to place his advanced training and education into practice by leading a departmental project. Doing so helps develop additional skills as well as fills a need and helps to better the department. |
| Technical Skills | M.S. | Darrin has met the standard for this category during this rating period. |
| Initiative and Innovation | M.S. | Darrin had to be reminded a few times during this rating period that his response times need to continue to improve. I challenge Darrin to develop new techniques and ideas in how he personally can improve upon his response times. |
| Judgment and Problem Solving | M.S. | Darrin was angry at the beginning of this rating period and did not react appropriately when he found out that BC Miller was going to be his new supervisor on Second Platoon. Other supervisors made me aware that Darrin spoke angrily to many peers and supervisors, calling BC Miller a "uniform Nazi" because BC Miller held people accountable for wearing the uniform according to written policy. When confronted with this information, Darrin denied that he said anything like this despite several witnesses that stated otherwise. BC Miller and Darrin later had a meeting about BC Miller's expectations from Darrin. Throughout the rest of this rating period, Darrin met most of the established expectations. |
| Communication | M.S. | Darrin has a tendency to shut down when counseled. When |

| | | |
|---|---|---|
| and Public Relations | | counseled by BC Durrenberg and BC Miller about why he was angry about getting BC Miller as his supervisor, Darrin didn't give any reasons. He simply asked for expectations and left the meeting without giving any input. Darrin told me that he made the internal decision to "turn a new leaf" and try to improve his attitude towards BC Miller and the department. |
| Teamwork | M.S. | Darrin possesses a strong leadership potential. This rating period, he encouraged his crewmates to further their education and work towards obtaining their degrees and Blue Card certification. I consider Darrin's attitude towards administration as poor, though. He doesn't seem to trust fire administration evidenced by one sided conversations from officers when addressing problems. There is little to no mutual exchange of thoughts or ideas during these meetings. I challenge Darrin to further exercise his leadership potential by showing his support for Fire Administration as they work towards improving our department. |

{¶ 38} Several KFD employees stated that many of Miller's criticisms of Townsend were unjustified. Stapleton said in her affidavit that, after Miller was assigned as battalion chief for their station, she and others "jokingly called him the uniform Nazi because he was so obsessed with our uniforms being perfect and every button buttoned." Stapleton Aff. ¶ 6. Morgan agreed that most of the department referred to Miller as a "uniform Nazi" and it was not a name that Townsend had given him. Morgan Depo. 35. Morgan stated that it would be unreasonable for Miller not to be aware that others beside Townsend were using that moniker. Morgan Depo. 36. To Stapleton's knowledge, no one other than Townsend was confronted for calling Miller a "uniform Nazi." Stapleton Aff. ¶ 6.

{¶ 39} Stapleton further wrote:

I understand that Capt. Townsend's supervisors justified lowering his performance ratings by making negative comments against him. Capt. Townsend was criticized for alarm and billing errors, though to my

understanding his alarm and billing errors were relatively low. In addition to the negative comments, KFD management criticized him for not being involved in department activities, while denying his requests to take departmental classes and participate in departmental projects. * * *

Stapleton Aff. ¶ 7.

{¶ 40} When asked about reporting errors, Townsend testified that another firefighter had significantly more alarm reporting errors than he did (one firefighter reportedly had at least 200 errors), but that person's supervisor did not consider that higher amount to be significant enough to include in an employee evaluation. Townsend Depo. 114-116. Morgan stated that billing errors were not uncommon. Morgan Depo. 20.

{¶ 41} Stapleton had been on many fire scenes and paramedic runs with Townsend, and she reported that she had never seen him moving slowly or without purpose at an emergency. She explained that she had observed Townsend "using restraint needed to properly assess an emergency scene, while overexcited firefighters were rashly placing themselves in danger and potentially causing unnecessary risk of harm to others * * *." Stapleton Aff. ¶ 12. Stapleton described Townsend's nursing skills as "unsurpassed in the department," and she stated that she had benefited from his guidance on taking patient histories. Stapleton Aff. ¶ 12. Assistant Chief Robbins, a former supervisor of Townsend, also stated that he had not observed Townsend "failing to move with purpose", "not moving fast enough," or being deficient in his response times. Robbins Depo. 43. Morgan stated that the administration seem to focus on Townsend's

speed, but he did not move slower than other people on different platoons, and he moved with purpose. Morgan Depo. 16-17. Morgan did not consider speed and response times to be fair topics of criticism for Townsend, and he noted that other people were slower than Townsend. Morgan Depo. 18-20, 25-26. Morgan never saw Townsend being lazy or trying to get out of difficult tasks. Morgan Depo. 26-27. Townsend's prior annual performance reviews did not include critiques regarding his response times or speed.

{¶ 42} Townsend was criticized for not participating in "payroll discussions." Payroll discussions were meetings that occurred on payroll Fridays during which the chief would provide up-to-date information and communicate with the crew on duty. (They are no longer occurring, as checks are no longer handed out.) Robbins Depo. 12. Morgan said that most firefighters participated "until we're retaliated against * * * and then you just stop talking." Morgan Depo. 33.

{¶ 43} According to Morgan, Townsend always worked to help train others or mentor someone who needed assistance, especially younger people, part-time employees, or volunteers. Morgan Depo. 37-38. Morgan disagreed that Townsend was "not a team player"; Townsend had no issues with his team. Morgan considered the criticism related to Townsend's relationship with management. Morgan Depo. 40-41.

{¶ 44} In his memorandum in opposition to summary judgment, Townsend argued that his poor evaluations in 2016 by Miller reflected Miller's "discriminatory effort to manipulate the promotion process." Memo. in Opp. 23. Construing the evidence in the light most favorable to Townsend, we conclude that genuine issues of material fact exist as to whether Miller engaged in a concerted effort to thwart Townsend's promotion for

unjustified reasons. If Townsend's version of events were believed, a jury could reasonably conclude that Miller's evaluations of Townsend and his conduct as part of the 2016 promotion process were done with a malicious purpose. Accordingly, the trial court did not err in denying Miller's request for summary judgment based on R.C. 2744.06(A)(6)(b).

{¶ 45} In arguing that the trial court erred in denying him the benefit of immunity under R.C. 2744.06(A)(6)(b), Miller's argument focused on Townsend's alleged inability to prove his discrimination and retaliations claims. He argued that negative performance evaluations, standing alone, cannot constitute an adverse employment action. We reiterate that we are not concerned with whether Townsend ultimately can prevail on his claims, and we decline to conflate Miller's alleged mental state with whether his conduct was actionable.

### 2. Chief Butts

{¶ 46} Butts was hired by KFD in May 1987. He was promoted to assistant fire chief in August 2012, to interim fire chief in March 2016 (upon the retirement of Chief Terry Jones), and to fire chief in April 2016. Butts Aff. ¶ 2. In his capacity as assistant fire chief, Butts signed and commented on Townsend's 2012, 2013, 2014, and 2015 annual performance reviews. He provided the following comments:

| | |
|---|---|
| 2012 | "Darrin you are a valuable member of this department. Your mentoring of younger personnel is a great attribute of yours. This department is in its very early stages of many new changes to make it a sustainable department well into the future. Hard work and dedication from all KFD personnel will be needed as we move into the future." Townsend Aff., Ex. Kettering 000981-984. |
| 2013 | "Darrin you continue to be a valuable member within the Kettering Fire Department. Your knowledge, skills, and ability are all positive attributes of yours. You should be proud of all our EMS accomplishments. Our department's goal of increasing our 24 hour staffed/in-house and immediate response coverage will take everyone's hard |

| | |
|---|---|
| | work and dedication to accomplish. I challenge you to be an intricate part of this department goal. Keep up the good work." Townsend Depo., Ex. D. |
| 2014 | "Darrin the positive comments from Battalion Chief Robbins reference your strong professional care during emergency scenes are great to read. You continue to perform your EMS skills at a high level. You should be proud of all your educational accomplishments. Your continued hard work with mentoring our department's newer members is appreciated. This type of hard work and commitment will continue to assist with our department's forward progression." Townsend Aff., Ex. Kettering G000744-747. |
| 2015 | "Darrin with your advanced education, training, knowledge, and time in our department you [are awarded] the benefit to have experienced all of the unprecedented changes to our department in the last several years. Fire Administration along with Local 2150 has worked together to successfully make unprecedented changes that have been requested for the last twenty years. I encourage you to see all of these positive changes for our department and our community. I challenge you to be positively involved with these changes that were, for many years, termed as unattainable." Townsend Depo., Ex. F. |

{¶ 47} Although Stapleton did not personally observe KFD management use racial slurs against Townsend, she stated that "it was well known in the department that Chief Butts * * * disliked him." Stapleton Aff. ¶ 3; *see* Morgan Depo. 23. During the 2016 promotion process, Townsend sought to work on the fire investigations unit (FIU), and then-Captain Williamson and then-Battalion Chief Roth had requested Townsend's participation. Townsend's request for the project was denied by Chief Butts. Townsend Depo. 96-98. When Townsend asked Williamson why he had been denied, Williamson told Townsend that "they don't like you." Townsend Depo. 98. Morgan stated that project assignments were a way to manipulate the promotion process. Morgan Depo. 14.

{¶ 48} During the promotion process for the 2016 captaincy vacancy, Chief Butts spoke with the captains and battalion chiefs who supervised and/or interacted with the seven candidates and, along with Assistant Chief Robbins, interviewed the applicants using a standard list of questions about their leadership abilities and perspectives. Butts

Aff. ¶ 8. Based on that information, he assigned AR scores to the candidates. Butts indicated that, when the AR scores were assigned, he did not know any of the candidates' scores on the other components of the promotion process. Butts Aff. ¶ 8.

{¶ 49} As to Townsend specifically, Butts received an ARRS from Miller, which described numerous shortfalls in Townsend's performance at KFD. The two spoke prior to Butt's interview with Townsend. During the AR interview, Butts asked Townsend about his "leadership deficiencies." Butts Aff. ¶ 13. The issues included: whether he had worked on projects, that Townsend did not stand in front during tours of firehouse (showed lack of leadership), that Townsend had reportedly said that he did not like the way KFD hired and promoted, Townsend's need to move with a sense of "urgency" and "purpose"/move faster during emergency situations, a comment he had made to a part-time firefighter, Townsend's comments that he did not want to be at new firehouse, and failure to attend payroll discussions. Townsend Depo. 34-47; Butts Aff. ¶ 13-18. In doing so, Butts echoed the deficiencies identified by Miller. Townsend believed that many of the criticisms were unwarranted, but for at least some of them, he did agreed they were true and did not provide explanations for his statements or actions. *See* Townsend Depo. 34-50.

{¶ 50} Butts gave Townsend the lowest AR score (11) among the seven candidates. Butts Aff. ¶ 19, Ex. A. The third-place candidate, who Townsend and Morgan believed was the preferred candidate, received the highest score (18). *See* Morgan Depo. 16.

{¶ 51} After all seven candidates were ranked based on their five weighted scores,

Chief Butts conducted interviews with the top three candidates. In his one-on-one interview with Townsend, Chief Butts told Townsend that he had the most experience and the most education but "that didn't matter." Townsend Depo. 60, 64. Townsend perceived Butts as "very angry" and "not happy" during the interview. Townsend Depo. 65. Butts "basically told [Townsend] * * * all [his] faults and that was pretty much the end of it." Townsend Depo. 66.

{¶ 52} Butts did not select Townsend for the 2016 open captain position. When asked during his deposition about Townsend's behaviors that had shown a lack of leadership, Butts responded:

> It was just the overall package of his lack of leading people, lack of communication with supervision, his overall demeanor towards supervision, can he work with supervision, can he not work with supervision. His answers on the oral board for not taking a project on in the last three years, for not being basically – my words – a self-starter, so all of these were taken into consideration. Plus the behavioral issues of telling a part time firefighter to basically, you know – not quoted but – get your training, get the fuck out of the department, that to me was a behavior issue that – we would -- to my knowledge over the last three years, nobody's been promoted with those kind of things.

Butts Depo. 101-102. Butts commented on Townsend's subsequent 2016 annual performance review, writing:

> Darrin I echo the statements made by your supervisors in this performance

evaluation. I truly applaud your educational successes and your encouragement of peers to seek additional education. As I have stated to you in the past, you have an unlimited potential for progression in your career. I feel that it is a necessity that you allow yourself to accept constructive criticism and to have open dialog [sic] with our department's officers to include Fire Administration. Our department's supervisors and firefighters continue to strive to make our organization the best that it can be through open dialogue, accountability and working together to build strong professional relationships. I challenge you to self-initiate yourself into these working relationships between firefighters and our department's supervision. Throughout your career you have had the opportunity to see unprecedented change and progression in our department. I encourage you to become part of this progression and to work as hard as you can to assist our department as it continues to build towards many more successes into our future.

{¶ 53} In 2017, three additional captain positions became available. As part of that promotion process, Chief Butts received emailed comments from battalion chiefs regarding Townsend. Battalion Chief Lokai, who supervised Townsend between early September and later December or 2016, indicated that he had worked with Townsend to improve himself; the assessment was predominately neutral. Butts Depo. 142-143. Battalion Chief Weaver commented that Townsend spent a lot of time in the office and had limited interaction with crew, but Butts noted that he would "look at this assessment

with a grain of salt" because Weaver had limited exposure to Townsend. Butts Depo. 144. Battaliion Chief Panstingel had positive comments regarding Townsend, including that he had completed fire instructor school, had taught the classroom portion of the ACLS and received positive reviews, that he had trained the trainers, and that he had completed Fire Officer IV training. Finally, Battlion Chief Durrenberg reported that Townsend "had made some suggestions and presented some good ideas, that he appears to have worked through some confusions on directives for the stock room but that seems to be progressing," and that Townsend had been "vocal in providing leadership to the rest of the crew." Butts Depo. 146. In a subsequent email, Durrenberg added that his prior concerns about Townsend's initiative had been addressed and that Townsend "was a different employee than he had experienced previously." Butts Depo. 147.

{¶ 54} Townsend and Butts had another interview prior to Townsend's promotion to captain in 2017. According to Townsend, during that interview, the tone was "completely a 180 degree atmosphere as opposed to the first one." Townsend Depo. 106. Butts was supportive of Townsend, said he was doing a great job, and had only good things to say about him. Townsend Depo. 106. Townsend indicated that his job performance had not changed between the two interviews. Townsend Depo. 107.

{¶ 55} Construing the evidence in the light most favorable to Townsend, we find no basis to conclude that Chief Butt's conduct rose to the level of malicious, wanton, reckless, or in bad faith. We note that, in his memorandum in opposition to summary judgment, Townsend argued that he had presented "substantial evidence of A.C. Miller's racial animosity, that he intentionally manipulated Chief Butts' Administrative Review

interview of Capt. Townsend, and that Chief Butts relied on the ARRS criticisms that A.C. Miller had prepared, including the racial stereotypes and double standards of discriminatory expectations that A.C. Miller used to describe Capt. Townsend's performance." Townsend acknowledged in his deposition that he did not refute or provide explanations for several of the alleged deficiencies that Butts questioned him about. With the evidence before us, the most that can be said of Butts's conduct during the 2016 promotion process is that he potentially was negligent in relying on Miller's assessment of Townsend.

{¶ 56} Townsend presented evidence that he sought a position with the fire investigation unit, but Chief Butts denied the request. The request was made during the 2016 promotion process, and Butts explained that, based on the existing make-up of the FIU, he wanted to wait until the promotion process had concluded before anyone was appointed to that unit. Butts Depo. 87-88. In contrast, Townsend was told by then-Captain Williamson that he was denied the position because Butts did not like him. No one was added to the FIU until 2018, after all the promotions and other transitions in the KFD were completed. Even accepting that Chief Butts denied the request due to a dislike of Townsend, the evidence does not support a conclusion that Butts's action as to this request rose to the level of malice.

{¶ 57} With the evidence before us, the trial court erred in concluding that R.C. 2744.06(A)(6)(b) applied to Butts.

### C. Statutorily-Imposed Liability under R.C. 2744.03(A)(6)(c)

{¶ 58} The trial court did not address R.C. 2744.03(A)(6)(c), which removes an

employee's immunity if "[c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." Townsend argues that liability is expressly imposed under R.C. 4112.02(J). Under R.C. 4112.02(J), it is an unlawful discriminatory practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice * * *."

{¶ 59} The Ohio Supreme Court has cited R.C. 4112.02(J) as an example of a statute that expressly imposes liability on employees. *Hauser v. Dayton Police Dept.*, 140 Ohio St.3d 268, 2014-Ohio-3636, 17 N.E.3d 554, ¶ 12. In concluding that R.C. 4112.02(A) does not impose civil liability on employees, it reasoned that "when the General Assembly imposes individual liability for discriminatory practices, it does so expressly. If we were to conclude that the employer-discrimination provision in R.C. 4112.02(A) expressly imposes liability on employees, we would render the aiding-and-abetting provision in R.C. 4112.02(J) largely superfluous. That provision already holds individual employees liable for their participation in discriminatory practices." *Id.* The supreme court emphasized that its holding in *Hauser* was limited to R.C. Chapter 4112's provisions addressing "employer" discrimination. *Id.* at ¶ 15. It reiterated: "An individual political-subdivision employee still faces liability under other provisions of R.C. 4112.02 that expressly impose liability, including the aiding-and-abetting provision in R.C. 4112.02(J)." *Id.*; *see also Johnson-Newberry v. Cuyahoga Cty. Child & Family Servs.*, 2019-Ohio-3655, 144 N.E.3d 1058, ¶ 30 (8th Dist.) (R.C. 4112.02(J) expressly imposes liability on the employee of a political subdivision).

{¶ 60} In his complaint, Townsend alleged that Chief Butts and Assistant Chief

Miller aided and abetted the City in its discriminatory and retaliatory conduct. Complaint ¶ 16, 20. The trial court has concluded that genuine issues of material fact exist as to whether Butts and Miller engaged in discriminatory and retaliatory conduct. It is clear that, if the jury were to find in Townsend's favor, R.C. 4112.02(J) would operate to remove Butts's and Miller's immunity. Accordingly, under the procedural posture of this case, genuine issues of material fact preclude a conclusion, as a matter of law, that Miller and Butts are entitled to immunity.

{¶ 61} We recognize that it may appear logically inconsistent to find that Townsend has not presented evidence that Butts acted with a malicious purpose and yet conclude that R.C. 2744.03(A)(6)(c) applies. As Butts and Miller point out in their appellate brief, aiding and abetting is an intentional act. *See, e.g., Horstman v. Farris*, 132 Ohio App.3d 514, 527, 725 N.E.2d 698 (2d Dist.1999) ("[O]ne is not an aider and abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids[.]"); *Gibbs v. Meridian Roofing Corp.*, S.D.Ohio No. 1:17-CV-245, 2017 WL 6451181, *6 (Dec. 18, 2017). To aid and abet under R.C. 4112.02(J), a person must "actively participate in, or otherwise facilitate, another's discriminatory act in violation of R.C. 4112.02." *Martcheva*, 2021-Ohio-3524, 179 N.E.3d 687, at ¶ 74, citing *Johnson-Newberry v. Cuyahoga Cty.*, 2019-Ohio-3655, 144 N.E.3d 1058, ¶ 21 (8th Dist.).

{¶ 62} However, whether Butts aided and abetted in discrimination under R.C. 4112.02(J) is not before us, and we disagree that we must determine his entitlement to immunity by reviewing whether genuine issues of material fact exist on the aiding and

abetting claim. Indeed, in *Hauser*, the Ohio Supreme Court illustrated how the resolution of an immunity question under R.C. 2744.03(A)(6)(c) may be different or potentially conflict with the resolution of an underlying claim. *See Hauser*, 140 Ohio St.3d 268, 2014-Ohio-3636, 17 N.E.3d 554, ¶ 16 (*Genaro*, which addressed supervisor/manager liability for discrimination claims, was not binding authority on sovereign immunity issue under R.C. 2744.03(A)(6)(c)).

**{¶ 63}** R.C. 2744.03(A)(6)(c) recognizes the Ohio legislature's decision that sovereign immunity does not apply for certain kinds of claims. A claim under R.C. 4112.02(J) is one of those claims where civil liability is expressly imposed upon an employee and, consequently, the exception to immunity set forth in R.C. 2744.03(A)(6)(c) applies. Whether a plaintiff, such as Townsend, can prevail on the claim is a separate matter which, in this case, must be resolved at trial.

**{¶ 64}** Finally, we note that the Ohio legislature recently amended R.C. 4112.08 to provide that "no person has a cause of action or claim based on an unlawful discriminatory practice relating to employment described in division (A)(24)(a) of section 4112.01 of the Revised Code against a supervisor, manager, or other employee of an employer unless that supervisor, manager, or other employee is the employer." 2020 Sub.H.B. 352 (effective Apr. 15, 2021). R.C. 4112.01(A)(24)(a) includes unlawful discriminatory practices prohibited by R.C. 4112.02(J). The parties have not addressed the effect, if any, that the amendment to R.C. 4112.08 has on this litigation, and we decline to address it.

**{¶ 65}** In summary, although we disagree in part with the trial court's reasoning,

we agree with its ultimate conclusion that genuine issues of material fact exist regarding Chief Butts's and Assistant Chief Miller's entitlement to immunity under R.C. Chapter 2744. Accordingly, their assignment of error is overruled.

## V. Conclusion

**{¶ 66}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

John R. Folkerth, Jr.
Dawn M. Frick
James M. Schirmer
Hon. Kimberly A. Melnick